# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| TERRANCE S. MCKINNEY, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | **CASE NO:     1:15-cv-79-WCL-SLC** |
| | ) | |
| THE OFFICE OF THE SHERIFF OF | ) | |
| WHITLEY COUNTY, INDIANA and | ) | |
| TONY HELFRICH, in his official | ) | |
| capacity of deputy sheriff and his | ) | |
| individual capacity, | ) | |
|     Defendants. | ) | |

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

This Brief in response, as well as the Appendix, are filed pursuant to Federal Rule of Civil Procedure 56 and N.D. Ind. L.R. 56-1(b).  The Appendix, which is separately filed pursuant to (b)(2), includes a section labeled "Statement of Genuine Disputes" and contains the material facts that the Plaintiff contends are related to facts that are genuinely disputed.

## II.  STATEMENT OF MATERIAL FACTS

The Statement of Material Facts submitted by Defendants is supplemented as follows or disputed as set forth in the Statement of Genuine Disputes [Appendix – separately filed]:

### A.     Pre-employment

McKinney never had any kind of letter military reprimand and had an outstanding military service career.  [McK. Dep. p. 21, l. 5 - p. 22, l. 5]

McKinney was the only black/African-American ever employed by the Office of Sheriff of Whitley County ("WCSD") as a full-time merit deputy sheriff.  [McK. Aff. ¶ 5]

McKinney was hired on August 5, 2013.  [McK. Dep. p. 26, ll. 9 - 11; McK. Aff. ¶ 6]

McKinney applied, interviewed and was tested for pre-employment as a  full-time deputy sheriff merit position with the WCSD during a period of months.  [McK. Aff. ¶ 4]

    **B.**    <u>Post Hiring</u>  [Facts set forth in Statement of Genuine Dispute 8 in the Appendix]

    **C.**    <u>Lack of Training and Meaningful Law Enforcement Activities</u>   [Facts set forth in Statement of Genuine Dispute 8]

    **D.**    <u>Monthly Activity Reports</u>   [Facts set forth in Statement of Genuine Dispute 2]

    **E.**    <u>Commission Vehicle Mirror Damage</u>  [Facts set forth in Statement of Genuine Dispute 4]

    **F.**    <u>Commission Vehicle Crash with Guardrail</u>  [Facts set forth in Statement of Genuine Dispute 2]

    **G.**    <u>Juveniles Transport to Court</u>  [Facts set forth in Statement of Genuine Dispute 6]

    **H.**    <u>Texting While Driving</u>  [Facts set forth in Statement of Genuine Dispute 7]

    **I.**    <u>Prisoners Transport</u>   [Facts set forth in Statement of Genuine Dispute 5]

    **J.**    <u>Gasoline Credit Cards</u>  [Facts are set forth in Statement of Genuine Dispute 3]

    **K.**    <u>Employee's Service Record – Work Hours and Records</u>  [Facts set forth in Statement of Genuine Dispute 1]

    **L.**    <u>Traffic Stop</u>  [Facts set forth in Statement of Genuine Dispute 10]

## **III.  STANDARD OF REVIEW FOR SUMMARY JUDGMENT**

Summary judgment may be granted only if there are no disputed genuine issues of material fact.  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  When ruling on a motion for

summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.* (Citations omitted).  The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Kodish v. Oakbrook Terrance Fire Prot. Dist.*, 604 F.3d 490, 507 (7th Cir. 2010) (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)).  If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted.  *Payne*, 337 F.3d at 770.

A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* At 771.

More pointedly, the burden is *not* on the party moving for summary judgment "to produce evidence showing the absence of a genuine issue of material fact, even with respect to an issue on which the nonmoving party bears the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Rather "the burden on the moving party may be discharged by 'showing'– that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Id.*  In fact, "district courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that [her] had to come forward with all of [his] evidence." *Id.* (Citations omitted); *accord Jones v. Union Pacific Co.*, 302 F.3d 735, 740 (7th Cir. 2002).

3

# IV.  DISCUSSION

## I.  PLAINTIFF'S EMPLOYMENT CLAIMS

### A.  RACIAL DISCRIMINATION

**1.        Stated reasons for termination**

Under the date of May 15, 2014 was a communication from the Office of the Sheriff of Whitley County detailing discharge from employment of McKinney ("Termination Notice"). This Termination Notice listed only three reasons for dismissal:  (1) Submitting false work hours while attending the Indiana Law Enforcement Academy; (2) Violation of SOP Administration 07: Written or Verbal Orders, Directive and Policies; and  (3) Violation of SOP Administration 20: Use of Gasoline Credit Cards.  In a letter dated May 19, 2014 the Whitley County Board of Commissioners informed McKinney of the termination of his employment effective May 16, 2014 ("Letter").  This Letter lists five performance issues including the three set forth in the Termination Notice from Sheriff Hodges to McKinney and adds two Performance Correction Notices.  It is unclear why the Whitley County Board of Commissioners added two more issues when these were remote in time and were verbal and written warnings.  The inconsistency between the Termination Notice and the Letter is unexplainable.  In any event, it does appear that the Sheriff Hodges' termination recommendation, who is claiming that he fired McKinney [Defendants' Brief, p. 3], should be the governing document.  However, all five issues are addressed below as well as two others never mentioned as a basis of termination.

We respect to Plaintiff's employment claim, as set forth in Defendants' Memorandum, p. 1, Sheriff Hodges, at the sole discretion to terminate his employment without approval of the Merit Board [Memorandum, p. 1], terminated his employment [Memorandum, p. 3: Hodges Aff.

4

par. 10].  Sheriff Hodges termination decision was based upon "Plaintiff had multiple issues during his probationary period which lead to the Sheriff's decision to terminate his employment."  [Hodges Aff. par. 4]  The statement   expressly relies upon the cumulative effect of the three stated issues and not one alone.

Thus, while Sheriff Hodges claims exclusivity with McKinney's termination decision, the following are only "facts" stated in the Defendants' Memorandum at page 2 to support the three Termination Notice reasons.

> **"Finally, while attending the Indiana Law Enforcement Academy, he did not turn in his monthly report as required by the Whitley County Sheriff's Department SOPs, reported his time at the academy incorrectly and failed to fuel up at the county fueling station during his weekends home as required by the SOPs and instead used his county credit card."  [Hodges Aff. par. 9]**

The Defendants can only rely on all of these three issues in combination set forth in the Termination Notice as the basis for McKinney's firing.

**No. 1.        SUBMITTING FALSE WORK HOURS WHILE ATTENDING THE INDIANA LAW ENFORCEMENT ACADEMY**

The only specific, factual reference made in Defendants' Memorandum at page 2 was "... reported his time at the Academy incorrectly ..."

As far as the Employee's Service Record ("ESR"), also referred to as time sheets, the entries and the information are to be completed by the deputy only.  There is no SOP for that other than the Whitley County Government Policy Manual 3.6 prohibiting Chief Deputy Gatton from filling out McKinney's work hours on his ESR – but he admittedly did so.  This raises the simple question – Why is McKinney terminated for something Chief Deputy Gatton did?

With respect to SOP for policies and calculation of compensable and non-compensable time while attending ILEA, there is no SOP.

5

McKinney would email his hours to Chief Deputy Gatton who would fill out the time sheet.  So, according to Policy 3.6, Gatton was recording time of another employee's time record which is in violation of the policy.

The WCSD's Answers to Plaintiff's Interrogatory No. 12 that the sole person who filled out the time entries on the ESR, including those of McKinney, was Chief Deputy Gatton and not McKinney.

The WCSD's Answers to Plaintiff's Interrogatory No. 13:

> "**INTERROGATORY NO. 13:**  Identify the Standard Operating Procedure ("SOP") which determines the policies and calculations of compensable and non-compensable time while an officer of the Defendant attends the ILEA within the last four (4) years.
>
> **ANSWER:**  There is no Standard Operating Procedure regarding the policies and calculation of compensable and non-compensable time while an officer attends the ILEA."

Chief Deputy Gatton authorized McKinney time reporting of 10 hours per day.

McKinney also sought advice on how to properly fill out the ESR from Michelle Jones, Administrative Assistant to the Sheriff, and Sheriff Hodges and followed such.

**No. 2.        VIOLATION OF SOP ADMINISTRATION 07: WRITTEN OR VERBAL ORDERS, DIRECTIVE AND POLICIES**

The only specific factual reference made in Defendants' Memorandum at page 2 was "... while the Plaintiff was at the Indiana Law Enforcement Academy, he did not turn in his monthly report as required by the Whitley County Sheriff's Departments SOPs ..."

WCSD Answer to Interrogatory No. 15 indicates there is no order, directive or policy directly requiring the submission of Monthly Activity Reports.  It says it is a procedure taught officers during training and, apparently, when it refers to "this activity," it is referring to ILEA

6

states it would be in respect to when not at ILEA.

The Answers to Plaintiff's Interrogatory No. 15 indicates:

"**INTERROGATORY NO. 15:**  Identify the SOP that governs the filling out and completion of a monthly activities report of each officer of the Defendant while attending the ILEA within the last four (4) years and identify each person who made entries, filled out/completed such monthly activities report of the Plaintiff.

**ANSWER:**  There is no SOP that governs this activity; rather, it is a procedure taught to officers during training."

McKinney was never informed at any time until four days before his termination and while attending the ILEA that monthly activity reports were required.  Upon being informed of such, McKinney took the monthly activity report form available, filled out the sole missing report and within less than an hour communicated it to WCSD.  The activity forms contained nothing of any substance because McKinney is in ILEA ten hours a day receiving classroom instruction or commuting to the ILEA.  There was only **one** missing monthly activity report due.

**No. 3.**          **VIOLATION OF SOP ADMINISTRATION 20: USE OF GASOLINE CREDIT CARDS**

The only specific factual reference made in Defendants' Memorandum at page 2 was "... failed to fuel up at the County fueling station during his weekends home as required by the SOPs and instead used his County credit card."

WCSD issued gasoline credit cards were to be used other than at the fueling facility at Whitley County on weekends.  McKinney was trained to always sign the receipt.  Many of the copies of gasoline credit card receipts produced by the Defendants were not signed by the other deputies.  The important point is, if you look at the gasoline station that was used, many of them are in Plainfield which would be an indication that they were used by other deputies not at the WCSD fueling facility or on weekends and would have been used, as did the Plaintiff at a gas

station near the ILEA.  Such other officers suffered no adverse employment action.

Standard Operating Procedure Administration, No. 20, III, A, 3: "Gasoline credit cards shall be used only for purchases of gas and oil without prior approval from the Sheriff or Chief Deputy."  What it clearly states is a deputy can use it for purchases of gas and oil **without** prior approval and not just at the WCSD fueling facility.  If you look at the language, subparagraphs 2 and 3 are not connected with an "and" so, therefore, they are in the alternative.  In other words, you could fuel a commission vehicle at the county fueling facility or you could do an actual "arm's length purchase" with a retailer resulting in a cash transfer for gas and oil without prior approval of the Sheriff.  There was no violation because that is exactly what McKinney did.  Also, it was impossible not to use the Defendants' gas credit cards while at ILEA.

**No. 4.          PERFORMANCE CORRECTION NOTICE DATED 10/14/2013 – VERBAL
                      WARNING – DAMAGE TO COMPANY VEHICLE**

SOP Administration No. 15 clarifies some issues as to reporting damage to company property but does not delineate a time frame or other procedures that the Plaintiff failed to meet.

There were two damages to company vehicles.  The February 9, 2014, slipping on the slush and sideswiping the guardrail was reported appropriately by McKinney.  It was not the subject of a verbal warning and it was not on Travelers Insurance Detail Loss Report.  This incident is not factually supported in the Memorandum of the Defendants.

The other was the mirror incident in response to a deputy emergency call.  McKinney reported directly to the WCSD facility with the parts.  A report was in Sheriff Hodges' box within 15 minutes with pictures.  Sergeant Cory Patrick and Chief Deputy Gatton warned Plaintiff that he should have called first for onsite accident investigation per the SOP.  But, no onsite investigation was needed because of the deputy emergency.  The Standard Operating

Procedure Enforcement 06 – Crashes Involving Department Vehicles III B. 1. a. states the follow:  "All such crashes shall be investigated at the scene, as soon as possible, unless an emergency or other justifiable reason causes a delay."

By comparison, Deputy Kory Bailey did $5,000 of damage to his company vehicle – received no warning and was given the torn off bumper at the Sheriff's Christmas party.

Thus, McKinney met the SOP timeliness requirement and neither of these incidents were serious enough to be reported to Travelers Insurance for their Detail Loss Report.

**No. 5.          PERFORMANCE CORRECTION NOTICE DATED 12/20/2013 – WRITTEN WARNING – FAILURE TO COMPLETE A TRANSPORT AND FOLLOW VERBAL INSTRUCTIONS**

There were two prisoner transports done by McKinney on December 20, 2013.  One was from Westville and one was from Plainfield.  The No. 5 reason in the Letter was failure to complete a transport and failure to following instructions.  McKinney had no formal training in transport although he had performed some.  One of the prisoners was a violent offender, the other was not.  McKinney was the only deputy in the car so he would have had to control two prisoners that were not separated in the backseat.  Thus, he brought one from Westville to the WCSD facility then proceeded to Plainfield and brought the other one back.

Chief Deputy Gatton was talking to McKinney the night before the transport and was explaining directions how to get to Westville and he never specifically told McKinney this is what to do on the next transport.  Transporting two prisoners at one time was never specifically stated when McKinney talked to dispatch during the first transport.  The specific written orders, consistent with dispatcher's instructions, indicate exactly what McKinney was to do – which he did.

The two-prisoner transport is covered in SOP Enforcement No. 15, subsection G.   Under optimal conditions, only one prisoner shall be transported under the supervision of one officer, which McKinney followed.

The two other issues raised by the Defendants in their Memorandum are reviewed later in this Brief.

### 2.        Prima facie and incidences of discrimination

Defendants correctly state in their Memorandum at page 8 the following:

> "Under the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a plaintiff must first establish a *prima facie* case of discrimination by demonstrating that (1) he is a member of a protected class; (2) he met his employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside of the protected class received more favorable treatment.  *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 885 (7th Cir. 2012)."

It is presumed and the Defendants have not argued that McKinney did not demonstrate that he was a member of the protected class or that he suffered adverse employment action.  The Defendants focus on whether or not McKinney was meeting his employer's legitimate job expectations and whether similarly situated employees outside the protected class received more favorable treatment.

The Defendants proceed in their Statement of Undisputed Material Facts to present facts related to four issues other than those in the Termination Notice involving McKinney violating standard operating procedures and being given a warning [Hodges Aff. par. 5].  These were presented presumably to support that McKinney was not meeting his employer's legitimate expectations.  The first issue relates to the Plaintiff having two chargeable accidents with his commission vehicle.  The first involved the minor mirror damage which was reported as required

by standard operating procedures when McKinney drove the vehicle to the WCSD station.  The

Plaintiff was given a verbal warning for failing to timely report this accident [Hodges Aff. par.

5].  This incident took place at least six months before termination.  The second issue relates to

the incident wherein the "Plaintiff was late taking juveniles to court for an appearance."

[Hodges Aff. par. 6]  The third issue was December 10, 2013 when a "fellow officer reported

that she observed Plaintiff texting while driving on a transport."  [Hodges Aff. par. 7]  The fourth

issue was December of 2013 with respect to prisoner transports involving Westville correctional

facility and Plainfield correctional facility and it states, "He then made the transport from

Westville but never went to Plainfield."  "He did not contact anyone with the Sheriff's

Department and obtain permission to disregard the transport order.  The Plaintiff was given a

written warning for this." [Hodges Aff. par. 8]

Decisional authority allows direct evidence of intentional discrimination.  *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973).  McKinney in the Statement of Genuine Disputes

has presented at length in Dispute 9 what a reasonable trier of fact could determine includes

direct evidence supporting racial discrimination.  Even if this Court does not deem the recitation

of over 15 incidences to be direct evidence of racial discrimination, the evidence morphs into a

support of circumstantial evidence involving the convincing mosaic analysis.  This body of

decisional authority is analyzed as follows:

> "Plaintiff submits a new argument to this Court that 'a plaintiff may also establish
> a Title VII claim by showing a convincing "mosaic" of circumstantial evidence
> such that a reasonable jury could infer discriminatory intent.'"  *Giraldo v. City of
> Columbia*, 47 F.Supp.3d 430, 433 (D.C. S.C. 2014)

> "*Hobgood v. Ill. Gaming Bd.*, 731 F.3d, 635, 643 (7th Cir.2013) for the mosaic
> theory analysis.  In *Hobgood*, the Seventh Circuit explained

> [n]o single piece of evidence might amount to a smoking gun ...
> but the convincing mosaic approach allows a plaintiff to establish
> retaliation "by assembling a number of pieces of evidence none
> meaningful in itself, consistent with the proposition of statistical
> theory that a number of observations each of which supports a
> proposition only weakly can, when taken as a whole, provide
> strong support if all points in the same direction".

731 F.3d at 647.  It appears that the mosaic theory was established in the Seventh
Circuit over twenty years ago; therefore, it is firmly established precedent within
the Seventh Circuit."

*Troupe v. May Dept. Stores Co.*, 20 F.3d 734 (7th Cir. 1994) – pregnancy discrimination

case.

> "Three types of circumstantial evidence of intentional discrimination can be
> distinguished."

> "... with the first kind of circumstantial evidence, the kind that consists of
> ambiguous statements, suspicious timing, discrimination against other employees,
> and other pieces of evidence none conclusive in itself but together composing a
> convincing mosaic of discrimination against the plaintiff."

> "For it is not true that to get over the hurdle of summary judgment a plaintiff must
> produce the equivalent of an admission of guilt by the defendant.  All that is
> required is evidence from which a rational trier of fact could reasonably infer that
> the defendant had fired the plaintiff because the latter was a member of a
> protected class."

The conclusion should be that all the reasons set forth by Sheriff Hodges are baseless as

discussed in the following decision.

*Stewart v. Henderson*, 207 F.3d 374. 376 (7th Cir. 2000) – Title VII race case.

> "... through indirect evidence, which can be accomplished by establishing that **the
> reasons given by the employer are factually baseless, were not the actual
> motivation for the decision, or were insufficient to motivate the decision**."
> [emphasis added]

McKinney contends there is sufficient circumstantial evidence of intentional

discrimination.  He outlines in this Brief, as well as in the Statement of Genuine Disputes Issue

12

9, sufficient facts to support his early suspicious during his tenure of employment.  The "black coffee" comment by Deputy Schmidt.  The refusal to be trained in any meaningful manner.  The warehousing of McKinney at the WCSD office and in dispatch and not on the road riding with other officers and performing normal deputy tasks.  Deputy Bailey being treated differently with respect to vehicular damage to his commission vehicle.  While on duty and in patrol being required to hang out at a deputy's house and attend fish fries and watch basketball games.  The no conversation treatment by Sergeant Patrick.   Prolonging the delay for his attendance to ILEA.  Being counseled for failure to get two juveniles to court on time when he was given improper information.  Texting while driving when he was not texting and driving but entering in a password to get the GPS to get his assigned location.  Failure to follow orders with respect to the transport of two prisoners from Westville and Plainfield when McKinney explicitly followed the dispatcher's direction and the two written, transport orders require exactly what McKinney did.  In addition, the stated reasons tendered by the Termination Notice and the Letter, all of which were false and baseless.

The analysis as follows appears to defer to the factfinder to do the ultimate factual inquiry and not the Court on summary judgment.

*Hill v. Tangherlini*, 725 F.3d 965, 967 (7th Cir. 2013) – Title VII case based upon discrimination by race and retaliation.

> "The court stated that Hill was not meeting GSA's legitimate expectations because he had engaged in a pattern of behavior that led three different coworkers to report him to their supervisors, and that the white female intern was not a suitable comparator because only one coworker had ever complained about her behavior."

*Turgeon v. Premark Intern., Inc.*, 87 F.3d 218, 221 (7th Cir. 1996) – sex discrimination

13

and retaliation case.

> "Under the *McDonnell Douglas* framework, '[e]ven if the reasons proffered are eventually found by the trier of fact not to be the real reasons for the adverse treatment, to prevail the plaintiff must still carry his ultimate burden of persuasion–to prove by a preponderance of the evidence that an illegal motive was at work.'"

> "However, under any scenario, '[w]hether the defendant intentionally discriminated against the plaintiff is, of course, the ultimate factual inquiry in a Title VII case.'"

Much emphasis is placed by the Defendants on the fact that Sheriff Hodges hired and fired McKinney at their Memorandum page 12.  This appears not to be strongly supported by the facts.  Sheriff Hodges had virtually little information about McKinney.  McKinney was always being observed by and reporting to Sergeant Patrick and Chief Deputy Gatton.  Those were the two employees of WCSD that had all the information on McKinney and presumably fed it to Sheriff Hodges as he was trying to justify the Termination Notice.

However, the case law states relating to *Our Lady of Resurrection Med. Ctr.* that the same actor theory in some circumstances may help to convince a jury that Defendants proffered legitimate reasons for its decision are worthy of belief, it is the province of the jury rather than the Court, however, to determine whether the inference generated by the same actor evidence is strong enough to outweigh Plaintiff's evidence of pretext.  This seems to be a clear direction that, again, these kind of analyses and decisions are to be left to the jury.  McKinney has strongly presented the fact that Sheriff Hodges really wasn't the person driving the decision.  Sheriff Hodges was in the last seven months of his tenure as Sheriff.  Chief Deputy Gatton had already been elected and was ready to take office.  Thus, cleaning the WCSD of McKinney would clearly have been motivated by Chief Deputy Gatton and not Sheriff Hodges.

14

The unity of the hirer/firer actor is left to the jury to weigh.  This is set forth in *Williams v. Vitro Services Corp.*, 144 F.3d 1438, 1442 (11th Cir. 1998) – age discrimination case.

> "Vitro, however, urges that we presume a lack of discriminatory motive in this case based on the fact that the same actor was involved in the decision to hire, promote, and terminate Williams."

> "Every other circuit to have reached this question has determined that, where the facts indicate that the same individual both hired and fired an employee, an inference may arise that the employers' stated justification for terminating the employee is not pretextual."

> "*E.E.O.C. v. Our Lady of Resurrection Med. Ctr.*, 77 F3d 145, 152 (7th Cir. 1996) ('If Boettcher wished to discrimination against Braddy because of her race, she could have refused to hire here in the first place, or she could have discharged here because of her deficient qualifications.  Boettcher did neither....  The same hirer/firer inference has strong presumptive value.')  *But see Waldron v. SL Industries, Inc.*, 56 F.3d 491, 496 n. 6 (3rd Cir.1995) ('[W]here ... the hirer and firer are the same and the discharge occurred soon after the plaintiff was hired, the defendant may of course argue to the factfinder that it should not find discrimination.  But this is simply evidence like any other and should not be accorded any presumptive value.')."

> "Evidence that the same actor both hired and fired the plaintiff, in some circumstances, may help to convince **a jury** that the defendant's proffered legitimate reasons for its decision are worthy of belief; it is the province of the jury rather than the court, however, to determine whether the inference generated by 'same actor' evidence is strong enough to outweigh a plaintiff's evidence of pretext."  [emphasis added]

The influence of Chief Deputy Gatton and Sergeant Patrick, both of which had all the information being used by Sheriff Hodges, is put in the proper perspective as follows.  The following decisional authority illustrates this theory of who the real decision makers are.

> "Although statements by a nondecisionmaker ordinarily do not satisfy a plaintiff's burden of proof in an employment retaliation case, this court has recognized that 'if a manager with a retaliatory motive is involved in the [employment] decision ..., that retaliatory motive, in some circumstances, may be imputed to the company, even if the manager with a retaliatory motive was not the ultimate decisionmaker.'"

"Specifically, we have stated that the retaliatory motive of a 'nondecisionmaker' may be imputed to the company where the 'nondecisionmaker' influenced the employment decision by concealing relevant information from, or feeding false information to, the ultimate decisionmaker.  'In such a case, the [retaliatory] motive of the other employee, not the autonomous judgment of the nondiscriminating decision-maker, is the real cause of the adverse employment action.'" *David v. Caterpillar, Inc.*, 324 F.3d 851, 860 (7th Cir. 2003)

### 3.　　Meeting employer's reasonable expectations

The Defendants cannot use the three reasons set forth in the Termination Notice as also showing McKinney was not meeting his employer's reasonable expectations.  The thrust of the burden-shifting method is to get past the prima facie case requirements to determine whether of not the proffered reasons by the employer are reasonable and without pretext, embraces Judge Diane Woods' analysis of collapsing all three steps into one global inquiry.  If, the Court was commanded to equate the proffered termination reasons with the Plaintiff did not meet the reasonable expectations of his employer without further inquiry, such would make every burden-shifting case a winner for the employer.  Thus, logically it makes no sense to give unfettered credence to factor 3 in the prima facie case and not inquire further as to the "reasonable" expectations of the WCSD, yet give it a double emphasis in step 2 and step 3 of the burden shifting analysis.  McKinney has shown the four other issues raised by Sheriff Hodges as being used as basis for McKinney not reaching the employer's reasonable expectations – are not legitimate or even remotely factually true and, thus, the Court should move on to step 2 and step 3.

### 4.　　Similarly situated employees

The fourth factor of the prima facie case involves similarly situated employees being more favorably treated.  McKinney has cited at least five to ten examples of white deputies

16

having more severe violations of the policy manual, as well as the SOPs, and each one of them

has remained employed by WCSD.  See Appendix Ex. 12.

### 5.      Pretext

*Wade v. Lerner New York, Inc.*, 243 F.3d 319, 323 (7th Cir. 2001) – age discrimination

case.

> "A plaintiff can establish pretext 'directly with evidence that [an] employer was
> more likely than not motivated by a discriminatory reason, or indirectly by
> evidence that the employer's explanation is not credible.'"

> "Lerner's stated reason for disciplining her is merely a pretext for discrimination
> by showing that Lerner's reason is: (1) factually baseless; (2) not the actual
> motivation for the discipline; or that it is (3) insufficient to motivate the
> discipline."

> "'It is not sufficient for the employee to show that his employer fired him for
> incorrect or poorly considered reasons.  He must establish that the employer did
> not honestly believe the reasons it gave for terminating him.'"

*Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1174 (7th Cir. 2002) – Title VII case based upon

race.

> "... defendant's proffered reason for its employment decision was false, i.e.,
> pretextual, that is 'one form of circumstantial evidence that is probative of
> intentional discrimination, and it may be quite persuasive.'  But '[i]t is not enough
> to disbelieve the employer; the factfinder must believe the plaintiff';s explanation
> of international discrimination.'"

> "Pretext 'means a lie, specifically a phony reason for some action.'

> "'Pretext for discrimination' means more than an unusual act; it means something
> worse than a business error; 'pretext' means deceit used to cover one's tracks."

McKinney has set forth numerous examples that would support pretext with respect to

the Defendants' explanation for the combination of all three issues set forth in the Termination

Notice.  There are actually direct contradictory statements set forth in each Issue of Genuine

Disputes that show allegedly failing actions solely done by Chief Deputy Gatton instead of

McKinney and the bald statement that there was a standard operating procedure for the activity and the Answers to Interrogatories as stated under oath shows there is no SOP.  Every incident shows McKinney following the SOPs, instructions and protocol and Sheriff Hodges' Affidavit stating something completely opposite.

## B.  RETALIATION

*Giraldo*, p. 432 – a case based on retaliation under Title VII and discrimination and retaliation of the FMLA sets forth the basic requirements.

> "To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show (1) she engaged in protected activity, (2) the employer took adverse employment action against her, and (3) a causal connection existed between the protected activity and the adverse action."
> "Because credibility determinations are often crucial in retaliation suits, we are particularly careful in such cases 'to avoid supplanting our view of the credibility or weight of the evidence for that of both the jury (in its verdict) and in the judge (in not interfering with the verdict).'"

*Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 824 (7th Cir. 2014) – sex discrimination and retaliation claims under Title VII clears up any of Defendants' claims to remoteness.

> "Her retaliation claims relating to those positions, the court said, were implausible because of the amount of time that had passed (several months) between any protected activity and the denial decisions." *David*, p. 858

> "But no bright-line timing rule can be used to decide whether a retaliation claim is plausible or whether it should go to a jury.  Other factors can always be relevant. 'A mechanistically applied time frame would ill serve our obligation to be faithful to the legislative purpose of Title VII.  The facts and circumstances of each case necessarily must be evaluated to determine whether an interval is too long to permit a jury to determine rationally that an adverse employment action is linked to an employee's earlier complaint.'" *Id.*, p. 829

> "In this case, Carlson has alleged that the resolution of her 2007 lawsuit in 2009 sparked animosity right away and that all of her attempts to advance at CSX since then have been thwarted.  She has described an ongoing campaign of retaliation, and her claims must be viewed through that lens."

18

"(affirming jury verdict for plaintiff on retaliation claim because, despite over four-year gap between grievance and termination, termination 'was the end result of an *ongoing* pattern of retaliatory behavior.'"

"(affirming jury verdict for plaintiff on retaliation claim because 'a plaintiff can establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period,' even if the intervening period spanned year)."

**"And the very complexity of the dance between the interdependent steps of the indirect proof method supports Chief Judge Wood's suggestion in her concurrence in *Coleman* that it is time to collapse the different methods of proof into one test; whether a rational jury could find that the employer took action against the plaintiff for an unlawful reason."** *Id.*, p. 830  [emphasis added]

1.      **McKinney is afforded a broad range of protections from unlawful employer conduct.**

As stated in *Porter v. City of Chicago*, 700 F.3d 944, 956 (7th Cir. 2012), the general policy is explained as follows:

"The purpose of this antiretaliation provision is to 'prevent employer interference with "unfettered access" to Title VII's remedial mechanisms ... by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers.'"

"Because of this purpose and the textual distinction between the antiretaliation provision and the antidiscrimination provision, the Supreme Court has held that 'Title VII's antiretaliation provision must be construed to cover a broad range of employer conduct ... and [it] is not limited to discriminatory actions that affect the terms and conditions of employment.'"

"Under this broad construction of the antiretaliation provision, **the pertinent inquiry is whether an employer has acted in a way that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination**.'"  [emphasis added]

2.      **McKinney engaged in statutorily protected activity.**

As a prerequisite to satisfying factor (1), a statutorily protected activity must exist for McKinney to engage in.  *Orton-Bell v. State of Indiana*, 759 F.3d 768, 776 fn. 6 (7th Cir. 2014).

The definition of such is set forth as follows:

> "'Title VII forbids retaliating against an employee because he has opposed any practice made ... unlawful ... by [Title VII], or because he has made a change, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII.]'  *Collins v. American Red Cross*, 715 F.3d 994, 998 (7th Cir. 2013)(quoting 42 U.S.C. § 2000e-3(a))."

McKinney may rely upon a complaint to an employer and such complaint must sufficiently indicate that the discrimination occurred..." within the classes protected under Title VII.  McKinney concedes that merely complaining of management's style or general harassment not related to sex is not sufficient to satisfy factor (1).  *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006).  McKinney, however, made it clear that race was always inferred if not mentioned.

The Seventh Circuit addressed this issue in *Davis v. Time Warner Cable of Southeastern Wisconsin*, 651 F.3d 664, 674 (7th Cir. 2011).  That case involved a terminated employee who complained to his supervisor as to various issues of alleged discriminatory treatment based upon race.  The plaintiff claimed that he was terminated on baseless grounds in retaliation for his informal comments to his supervisor.  The Seventh Circuit after adopting, albeit in different language, the same three factor requirement to prove retaliation by the direct method went on to make the following comment:

> "Time Warner makes only a half-hearted effort to dispute that Davis's informal comments to Cleboski are within the scope of protected activity.  That is wise, as we have held that 'an informal complaint may constitute protected activity for purposes of retaliation claims.'  *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009).  Davis's complaints to his supervisor here were much more direct than the query, 'Aren't you being discriminatory?' that we deemed protected in *Casna*.  We thus conclude that Davis's comments to Cleboski are 'protected activity' for the purposes of Title VII and § 1981."

3.    **The trier of fact has sufficient evidence to determine a causal connection between the statutorily protected activity and McKinney's termination.**

This factor (3) is arguably the most difficult to analyze because there is clearly no specific language "smoking gun."  However, that augers in favor of McKinney in order for the trier of fact to make the determination and draw reasonable inferences and not this trial court on summary judgment.  The extensive evidence, both direct and circumstantial, is set forth in the Statement of Genuine Disputes – Disputes 8 and 9.

In further support of McKinney is *Vance v. Ball State University*, 646 F.3d 461 (7th Cir. 2011).  McKinney claims a trier of fact reviewing the totality of the circumstances could find the many incidences set forth are clear.  *Vance* states that employers may not punish employees for complaining about workplace conduct if they even arguably do not violate Title VII.

## II.  INVESTIGATORY STOP BY DEPUTY HELFRICH

### A.  FEDERAL CLAIMS

1.    **UNLAWFUL SEIZURE**

Any claim for unlawful seizure is not well founded given the 911 call's content and appropriate law enforcement dispatch.

2.    **EXCESSIVE FORCE**

Even assuming the statement by the Defendants is correct as to the amount of force to be used at page 17 of the Memorandum, "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene ...".  The Defendants argue "de minimis touching" does not constitute excessive force.  This is where the stories diverge.  As set forth in the facts in Statement of Genuine Disputes Dispute 10, the trier of fact needs to make this call.

What was left out of this scenario painted by the Defendants was that McKinney was forced to get out of his truck and lay down in the middle of the traveled portion of the road face down while he was roughly handcuffed and was pulled up by his handcuffed lower arms for no reasonable purpose.

The case cited, *Tibbs v. City of Chicago*, 469 F.3d 661 (7th Cir. 2006), talks in terms only of the handcuffing being too tight causing a loss of feeling, discomfort, pain and numbness, including redness but no medical care for the plaintiff.  However, *Payne v. Pauley*, 337 F.3d 767 (7th Cir. 2003), does indicate that excessively tight handcuffing resulting in carpal tunnel surgeries was excessive and summary judgment was not appropriate under the circumstances. Plaintiff's claims of handcuffing with excessive force includes not only tightness of the handcuffs but the lifting and pulling up by the arms causing pain and discomfort in the hands, arms, shoulders and back area.  The Plaintiff's deposition testimony clearly states the physical symptoms that go well beyond those set forth in *Tibbs* or posited by Helfrich [page 18 of its Memorandum].  Deputy Helfrich, who was not being handcuffed, states he "did not use excessive force in handcuffing Plaintiff or assisting him to his feet while he was handcuffed." – This has no objective evidentiary weight.

The next argument posited by deputy Helrich is pointing his gun at the Plaintiff was not excessive use of force.  The Defendants cite *Williams v. City of Champaign*, 524 F.3d 826 (7th Cir. 2008), as saying police are allowed to point their guns when there is reason to fear danger. This was not a fear of danger situation.  This was a reported theft of a refrigerator.  This was not murder, assault, discharge of a weapon, a knife fight or any kind of physical combat.  The truck stopped in the same manner as if somebody had got stopped for speeding.  There is **no** evidence

22

presented that depicts Helfrich was in fear or that he had to protect himself with the use of the gun.

       3.      **EQUAL PROTECTION**

The Defendants statement at page 19 of its Memorandum indicates, "The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race."  The Defendants claim this requires "a showing of purposeful discrimination" which makes sense as opposed to accidental discrimination.  The two elements set out, based on decisional authority, are that: (1) the plaintiffs must prove that the defendants action had a discriminatory effect and (2) were motivated by a discriminatory purposes.  The first element is proven because the discriminatory effect was termination of the only black/African-American deputy ever in the employee of the WCSD.  The second element is motivated by a discriminatory purpose.  Those facts are laid out in detail in the Statement of Genuine Disputes, Dispute 8 and Dispute 9.  It is axiomatic that the Plaintiff has shown multiple members of the white deputies of the unprotected class, were treated differently.  This does not relate to the traffic stop but relates to the actual intentional discrimination by Sheriff Hodges.  This is an Equal Protection claim with respect to termination, not an Equal Protection claim with respect to the traffic stop.

## B.  POLICY CLAIM AGAINST WHITLEY COUNTY

There is no evidence that has been established by the Plaintiff to indicate that there is a custom or policy of constitutional deprivation by WCSD relating to excessive force arrests.  It is uncontradicted that deputy Helfrich has a history of citizens' complaints for use of excess force that doesn't appear to be able to translated into a WCSD policy.

## C.  QUALIFIED IMMUNITY

Qualified immunity may very well not apply in that deputy Helfrich was reacting to what appeared to be an appropriate dispatch based upon a 911 call of a burglary or stolen property incident in progress.  This did not entitle him in his official or individual capacity to inflict excessive force.

## D.  STATE LAW CLAIMS

### 1.       INDIANA TORT CLAIMS ACT

The Notice of Tort Claim was properly and timely served.  It is an undisputed statement of law that a Notice of Tort Claim has to be filed within 180 days of the incident occurring.   As stated, deputy Helfrich performed an investigatory stop on July 6, 2013 and a Notice of Tort Claim is by its own date signed and dated July 30, 2014.  Plaintiff never argued this notice was for the traffic stop.  The short plain statement of facts in the Notice of Tort Claim is directed towards the wrongful termination involving blackballing and intentional infliction of emotional distress – an intentional tort.  It is not required for any claims under 42 U.S.C. 1983 to have a Notice of Tort Claim filed.  It is a tort as a personal claim against deputy Helfrich in his individual capacity.

### 2.       FALSE ARREST

This is not a claim.

### 3.       INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Since this claim was directed to the Defendants under the ITCA notice – it does not involve deputy Helfrich's official action and is governed only by Sheriff Hodges termination. However, deputy Helfrich's individual actions stand on their own without the necessity of filing notice under ITCA.  The elements (2) , (3) and (4) are arguably satisfied by McKinney.  Element

24

(1) is left for the jury to determine if it was "outrageous."

      **4.**      **BATTERY**

This is a jury question.  Can deputy Helfrich actually say "his actions were objectively reasonable in light of the facts and circumstance"?

                                      **VEGELER LAW OFFICE LLC**

                              By:     /s/ Robert Owen Vegeler
                                      Robert Owen Vegeler (0947-02)
                                      110 West Berry Street, Suite 1200
                                      Fort Wayne, Indiana 46802
                                      Ph:    (260) 407-6161
                                      Fax:   (260) 407-6160
                                      robert@vegelerlaw.com
                                      Counsel for Plaintiff

                                **CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of September, 2016, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

      Julie J. Havenith, Esq.
      TRAVELERS STAFF COUNSEL OFFICE
      707 E. 80th Place, Suite 100
      Merrillville, IN 46410
      Attorney for Defendants

                                    /s/ Robert Owen Vegeler
                                    Robert Owen Vegeler