# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

TERRANCE S. MCKINNEY,     )
     Plaintiff,     )
     )
v.     )     **CASE NO:     1:15-cv-79-WCL-SLC**
     )
THE OFFICE OF THE SHERIFF OF     )
WHITLEY COUNTY, INDIANA and     )
TONY HELFRICH, in his official     )
capacity of deputy sheriff and his     )
individual capacity,     )
     Defendants.     )

## PLAINTIFF'S STATEMENT OF GENUINE DISPUTES

The Plaintiff, Terrance S. McKinney, by counsel, Robert Owen Vegeler of the Vegeler

Law Office LLC,  hereby submits Plaintiff's Statement of Genuine Disputes as follows:

    **1.**    **Dispute** – McKinney did not submit false work hours while attending the Indiana

Law Enforcement Academy ["ILEA"] but followed the specific instructions of Sheriff Hodges,

Chief Deputy Gatton and instructions of Michelle Jones, Administrative Assistant to the Sheriff.

McKinney sought guidance as to how to properly submit his work hours to be placed in the

Employee's Service Record.  The Whitley County Government Policy Manual 3.6 prohibits

anyone but the employee from filling out time on the Employee's Service Record. However,

Chief Deputy Gatton did such for McKinney as well as other officers before and after

McKinney.          **Facts**

    On March 31, 2014, McKinney reported to Indiana Law Enforcement Academy

("ILEA") in Plainfield, Indiana to commence a 15-week course on law enforcement training.

The schedule entailed at least 10 hours a day including breakfast and lunch at the academy

Monday though Thursday and occasionally sessions on Friday.  McKinney stayed on the ILEA campus in overnight accommodations and mainly ate at the ILEA cafeteria facility.  [McK. Aff. ¶ 17]

In McKinney's Termination Notice the WCSD went through each 10-hour day time report indicating that McKinney had violated the policy by not clocking out for lunch.  McKinney did not indicate that he was clocking out because you are at the academy – you do everything at the academy and you don't leave.  Therefore, you are not clocking out for lunch and he was never told to deduct time for lunch.  [McK. Dep. p. 101, ll. 1 - 25]

The Sheriff of Whitley County's Answer to Plaintiff's Interrogatory No. 13 specifically requested to identify the standard operating procedure that determines the policies and calculation of compensable and non-compensable time while an officer attends the Indiana Law Enforcement Academy within the last four (4) years.  The Answer said, "There is no standard operating procedure regarding..."   [McK. Dep. p. 137, ll. 8 - 22 and App. Ex. 8]

All of the time records produced by the WCSD never indicated any other deputy attending ILEA clocked out.  All of the white deputies put in for 10-hour days and didn't have to clock out but McKinney had to and was told the time sheet entries were wrong.  [McK. Dep. p. 101, ll. 15 - p. 102, l. 1 and p. 107, ll. 1 - 16]

Based on the WCSD Answer to Interrogatory No. 12, Chief Deputy Gatton filled out McKinney's time sheets.  [McK. Dep. p. 147, l. 20 - p. 148, l. 21; and App. Ex. 8]

McKinney talked to both Chief Deputy Gatton and the Sheriff about how to mark down the time to be put on the time sheet and was told to calculate his hours and send them in.  [McK. Dep. p. 149, ll. 1 - 13]

2

The other deputies who did not have to clock out for lunch while at the academy were Billy Maddox, Dustin Auer and Brandon Smith.  At least one of them attended before McKinney was at the ILEA and one of them was after he was at the ILEA.  [McK. Dep. p. 101, l. 23 - p. 102, l. 6]

McKinney asked for specific instructions from Michelle Jones on how to properly fill out the time sheets while he was at ILEA of which he followed.  He doesn't believe he was compensated for the time that he put down but he also followed the instructions given to him on how to fill out the time sheet.  [McK. Dep. p. 132, ll. 2 - 13]

While attending the ILEA, McKinney asked for advice as to how to properly report his work hours both from Michelle Jones, Administrative Assistant to the Sheriff, as well as Chief Deputy Gatton.  He was informed by email from Jones to put down ten hours each day without deductions for breakfast or lunch [Ex. D].  On May 13, 2014, Chief Deputy Gatton emailed McKinney stating, "Authority Sheriff Hodges will get paid 40 hours a week for now.  He is doing some research and will go back with you."  On May 12, 2014, Jones in a response email told McKinney, "I will work on this.  In the past it has been 10 hours 4 days a week."  [Ex. D]. [McK. Aff. ¶ 31]

Deputy Dustin Auer was paid on a ten-hour day while attending ILEA as was deputy Brandon Smith and deputy Billy Maddox and all are still employed with WCSD.  [McK. Aff. ¶ 32 and Ex. E]

Sheriff Hodges told McKinney while attending ILEA to "just keep your time.  He said its ten-hour days.  Any time you do outside the ten hours, just blot down on your time and send it to me."  McKinney checked with Sheriff Hodges after about four weeks of attending ILEA by text

and asking if he was doing alright and Sheriff Hodges responded, "Yep, just keep doing what you're doing."  [McK. Dep., p. 97, l. 25 - p. 98, l. 10]

McKinney was told that he was going to get ten-hour days by Sheriff Hodges and other deputies at WCSD.  Ten-hour days yet McKinney sent in such time and was terminated for not clocking out for breakfast and lunch.  The time records produced by WCSD showed no white deputies clocking out for lunch while at ILEA and no discipline while McKinney was terminated for such.  These deputies were Billy Maddox, Dustin Auer and Brandon Smith.  [McK. Dep., p. 100, l. 22 - p. 101, l. 25]

Chief Deputy Gatton told McKinney upon his inquiry about documenting work hours prior to attending the ILEA – "Just mark down 10 hours."  [McK. Aff. ¶ 30]

The Whitley County Government Policy Manual 3.6 prohibits anyone but the employee from filling out time on the Employee's Service Record.  However, Chief Deputy Gatton did such for McKinney as well as other officers before and after McKinney.  [App. Ex. 8 & 9, McK. Aff. ¶ 33 and Ex. F]

2.    **Dispute** – McKinney did not violate SOP Administration 07: Written or Verbal Orders, Directive and Policies which involved the submission of monthly activity reports.  There is no standard operating procedure indicating the proper filling out and submission of monthly activity reports especially with respect to ILEA.  Upon being requested by Chief Deputy Gatton to submit the one missing and now due monthly activity report four days before McKinney's termination, McKinney filled out the report and communicated it to the Sheriff's Department within an hour.  There was only one monthly activity report that was not timely submitted or due by McKinney.

4

### Facts

McKinney's training with respect to monthly activity reports, of which there is no SOP on how to properly handle and fill out monthly activity reports, consisted of being handed a form and told to just write down traffic stops and, if you are doing warrants, just write down the number of warrants or how many papers you served.  There was no classroom training.  If he had any questions, he was just supposed to ask.  [McK. Dep. p. 45, ll. 1 - 16]

McKinney, with respect to monthly activity reports, was never informed by SOP or by order from Sergeant Patrick or Chief Deputy Gatton to fill out the one missing monthly activity report until four days prior to his termination.  There is no SOP for such monthly activity reports while attending ILEA in any manual or policy given to McKinney.  [App. Ex. 8 and McK. Aff. ¶ 29]

Plaintiff's Interrogatory No. 15:  "Identify the SOP that governs the filling out of a completion of a monthly activities report for each officer of the Defendant while attending the Indiana Law Enforcement Academy [" ILEA"] academy within the last four (4) years and identify each person who made entries, filled out or completed such monthly activities of the report."  The first sentence in the Answer to the Interrogatory is, "There is no SOP that governs this activity."  [McK. Dep. p. 138, l. 8 - p. 139, l. 7 and App. Ex. 8]

McKinney went to the ILEA starting on March 31, 2014.  The WCSD stated that there was an SOP that required an attendee such as McKinney at ILEA to complete a monthly activity report.  [McK. Dep. p. 94, ll. 9 -24 - p. 95, l. 25]

McKinney was never told he had to fill out a monthly activity report while at ILEA.  McKinney, upon being informed that such monthly activity report was to be completed, did such

within an hour.  It was the only such report that had to be filed or was due.  [McK. Dep. p. 94, l. 25 - p. 95, l. 5]

McKinney was never informed of an SOP requiring monthly activity reports while at ILEA.  He was never informed that the SOP was needed in any way relating to ILEA training environment because there are no arrests or warrants and he had already turned in his gasoline receipts so the monthly report would have been blank.  [McK. Dep. p. 95, ll. 1 - 21]

    **3.**    **Dispute** – McKinney did not violate SOP Administration 20: Use of Gasoline Credit Cards.  McKinney was told by the WCSD that he should not have his fuel tank in his commissioned vehicle at any time below half a tank.  Based upon the average mileage that the vehicle gets on the road, as well as the round-trip distance between Whitley County and Plainfield, Indiana where ILEA took place, it was impossible to fuel up at the WCSD fueling facility on the weekends and drive a round trip without getting gasoline somewhere along the trip.

    **Facts**

SOP Administration 20 related to fueling at the WCSD fueling facility which McKinney followed [App. Ex. 2].  As relates to his attendance at ILEA, McKinney prepared an analysis of the gas mileage and range that his commissioned vehicle could have in relation to the use of gasoline credit cards under SOP Administration 20 Use of Gasoline Credit Cards III. A.  That analysis which shows that McKinney could not make a round trip in order to use the county fueling facility in Whitley County on a full tank of gas, let alone a half tank of gas, which necessitated the use of gasoline credit cards and not filling up on weekends at the county fueling facility [Ex. C].  [McK. Aff. ¶ 18]

The approximate distance round trip from the WCSD to the ILEA campus was 297 miles. [McK. Aff. ¶ 19]

McKinney's commission vehicle a/k/a "squad car" averaged approximately 15 miles per gallon when traveling on road mileage.  The gas tank capacity on the commissioned vehicle was 19 gallons which gave McKinney an effect range on one tank of gas of 285 miles.  McKinney could not make a round trip from the WCSD to the ILEA campus and back on one tank of gas. [McK. Aff. ¶ 20]

McKinney had personal credit cards that were in his name and billed to his residence that were not used to fuel his county commission vehicle.  McKinney also had an issued WCSD government gasoline credit card (not in McKinney's name) and billed to the department.  [McK. Aff. ¶ 21]

McKinney inquired as to fuel consumption while attending ILEA.  He was informed to use his credit card to get fuel so that he could fuel up at the county fueling facility.  McKinney told them that you cannot make a round trip to Plainfield and back on one tank of gas so he was informed to use his fueling card and fill up at the county station when he could.  [McK. Dep., p. 98, l. 24 - p. 99, l. 23]

Before McKinney left for ILEA, Chief Deputy Gatton told him to make sure that he had his WCSD gasoline credit cards because he was going to need them.  [McK. Dep. p. 95, ll. 5 - 15]

McKinney was specifically instructed by Sergeant Cory Patrick, Deputy Scott Schmidt, Chief Deputy Gatton and Sergeant Todd Cook that the fuel tank on his commission vehicle should be kept at one-half tank is possible, due to the need to react to emergencies and be

7

involved in police chases.  [McK. Aff. ¶ 22]

Many other deputies used the WCSD gasoline credit cards while at the ILEA, the same as McKinney.  [McK. Dep. p. 136, ll. 5 - 12]

The gas receipts produced by other deputy sheriff's of WCSD while attending the ILEA show multiple uses of county gasoline credit cards not at the county fueling facility.  [App. Ex. 3 and McK. Aff. ¶ 23]

WCSD claimed there was an SOP requiring use of the Whitley County fueling facility on weekends – but there was no such SOP.  [ McK. Dep. p. 95, ll. 22 - 25]

4.      **Dispute** – McKinney properly reported damage to his commission vehicle in October of 2013.  Although the Sheriff in his Termination Notice did not rely upon this genuine dispute, it is placed here as one of the "four issues" raised showing that McKinney did not meet legitimate employment expectations.  McKinney followed standard operating procedure and was given a verbal warning which was improper.

**Facts**

The Standard Operating Procedure Enforcement 06 – Crashes Involving Department Vehicles III B. 1. a. states the follow:  "All such crashes shall be investigated at the scene, as soon as possible, unless an emergency or other justifiable reason causes a delay."  [App. Ex. 4 and McK. Aff. ¶ 24]

As McKinney was backing out of his garage, Deputy Bailey's emergency message went off indicating an emergency with an officer in trouble.  Distracted, McKinney backed the vehicle out, he clipped the mirror and chipped three little pieces off.  He drove directly to the WCSD, inquired as to whether Deputy Bailey was alright and he was told that he had just pressed the

wrong button and was not an officer in emergency trouble.  McKinney reported that he had

nicked three pieces off his mirror.  Detective Spencer told him it was no big deal.  He said let

dispatch know, write a report and take pictures of it.  McKinney completed all those tasks and

had it in the Sheriff Hodges' file within 15 minutes after his arrival at the station.  Thereafter he

got called into a meeting with Sergeant Patrick and Chief Deputy Gatton and was given a letter

of reprimand which was another red flag indicating they were trying to develop a termination

paper trail on McKinney.  He felt Sergeant Patrick and Chief Deputy Gatton wanted him out

from the very get go.  They had a plan the whole time.  [McK. Dep. p. 68, l. 18 - p. 72, l. 23]

     McKinney received a performance correction notice with a verbal warning despite

having explained to Sergeant Patrick and Chief Deputy Gatton the circumstances, as well as

turning in the appropriate report within 15 minutes arriving at the WCSD facility.  Such incident

was not reported as a loss to the Sheriff's insurance carrier, Travelers Insurance, and was not

listed in the Detailed Loss Report.  [App. Ex. 5 and McK. Aff. ¶ 25]

     Originally, McKinney was to get a written reprimand for the side mirror incident but

ended up receiving a verbal warning.  This matter was handled solely by Sergeant Patrick and

Chief Deputy Gatton who, after counseling by themselves behind a closed door, decided to give

McKinney a verbal warning.  As a comparison, Deputy Bailey tore off the whole front bumper

from his car and was given it as a gift at the Christmas party and no disciplinary action occurred

to him.  [McK. Dep. p. 69, l. 14 - p. 72, l. 6 & p. 76, ll. 1 - 13]

     Also, McKinney did not violate any SOP – Enforcement 06 involving an accident with

his commission vehicle by failing to keep it at the scene and call another officer to make a report

because there is an exception in the SOP when an officer has pressed an emergency button and

could be in trouble. Since deputy Bailey's emergency button went off indicating an emergency involving him as an officer down or in trouble then deputies with a damaged commission vehicle are not required to wait for another officer to come out and make a report but you respond to help your fellow officers. [McK. Dep. p. 73, l. 2 - p. 74, l. 6]

By this time McKinney had never had any training on how to deal with a property damage accident to his commission vehicle. [McK. Dep. p. 74, ll. 2 - 24]

Deputy Bailey not only tore the bumper off of his commission vehicle and was presented it as a gift at the Christmas party without disciplinary action, he went 3,000 miles over his first oil change deadline and received no disciplinary action. [McK. Dep. p. 96, l. 18 - p. 97, l. 6]

The two commissioned vehicle damage incidents were never reported on the Travelers Insurance Detail Loss Report and, therefore, apparently were not deemed necessary to be reported by WCSD to its insurance company. [App. Ex. 5 and McK. Aff. ¶ 26]

Sergeant Patrick and Chief Deputy Gatton also told McKinney at the damaged mirror meeting that they were going to change the dates of his police academy and McKinney felt that they were prolonging his non-attendance at ILEA was a way to get him out before they sent him to the academy. [McK. Dep. p. 76, l. 23 - p. 77, p. 14]

McKinney did everything according to procedure, when he had another property damage accident during a transport in a snow-related crash into a guardrail. McKinney still ending up with disciplinary mention. [McK. Dep. P. 78, ll. 4 - 23]

**5.** **Dispute** – McKinney properly followed his written orders and verbal orders for prisoner transportation involving two prisoners – from Westville correctional facility and Plainfield correction facility to the WCSD. Although the Sheriff in his Termination Notice did

10

not rely upon this genuine dispute, it is placed here as one of the "four issues" raised showing that McKinney did not meet legitimate employment expectations.  The written transport orders showed that McKinney followed the appropriate procedure and that he completed the transport of both prisoners as ordered.

### Facts

In December of 2013, the WCSD had another issue involving a transport in which McKinney was involved.  McKinney completed the transport orders as written and as instructed. He transported a prisoner from Westville correctional facility to the WCSD facility, then he went to Plainfield correctional facility and picked up another prisoner and transported him to the WCSD facility.  McKinney did exactly as he was instructed by the dispatcher in that the dispatcher never indicated that he was supposed to go from Westville to Plainfield and bring both prisoners back to Whitley County.  Exhibit 1 and Exhibit 2 to McKinney's deposition show that McKinney did exactly as the transport orders said.  The WCSD claims that McKinney was instructed to go from Westville to Plainfield and then back to the WCSD facility.  When McKinney brought the prisoner back from Westville, he talked to Michelle Jones, Administrative Assistant to the Sheriff, and was instructed by Sheriff Hodges through Michelle Jones that he had pick up the prisoner in Plainfield.  McKinney indicated he would cancel his dinner plans and transported the prisoner, returned back and was only 30 minutes over his shift for which he got paid.  McKinney spoke to Chief Deputy Gatton specifically about the issue and Gatton instructed McKinney to properly block down the half-hour overtime for which he was paid.  McKinney never refused to get the prisoner in Plainfield and bring him back and strictly followed the instructions as verbally told to him and as in the transport orders.  [McK. Dep. p.

11

86, l. 4 - p. 90, l. 6 and App. Ex. 6]

McKinney properly transported as both instructed in writing by two written transport orders and orally by the Administrative Assistant to the Sheriff, Michelle Jones, as well as his superiors, Sergeant Patrick or Chief Deputy Gatton [McKinney Dep. Ex. Nos. 1 and 2] which show McKinney signing the transport orders and showing the requirement: [No. 1]  that the prisoner be transported from Westville correctional facility to the "Receiving facility/ institution or agency OTC–Whitley Co.; and [No. 2] transported from STP [Plainfield correctional facility] to "Name of facility or agency transported to parole discharge/Whitley Co–TOT."  McKinney was never informed as he communicated with dispatch during the prisoner transport from Westville correctional facility to the WCSD that he should change route and go directly to Plainfield and pick up the second prisoner and bring both to WCSD at the same time.  SOP requires one officer per prisoner, not one officer per two prisoners.  One of the prisoners was a violent offender and the two prisoners could not be separated in the backseat during transport. McKinney and the releasing deputy signed the transport orders [App. Ex. 6].  [McK. Aff. ¶ 27]

It was never communicated to McKinney that he had to go directly from Westville correctional facility to the Plainfield facility without returning to the WCSD facility in between. The dispatcher never told McKinney otherwise.  If he had been communicated to go directly, he would have done it and he did complete the tasks.   [McK. Dep. p. 90, ll 3 - 17 and p. 155, ll. 3 - 22]

The Whitley County SOP Enforcement 15 Transporting and Processing Prisoners III. G. states that only one prisoner should be transported by one deputy sheriff and not two prisoners transported by one deputy sheriff.  [App. Ex. 7 and McK. Aff. ¶ 28]

12

McKinney received a written warning from Sheriff Hodges despite the fact that he explicitly followed the verbal instructions from the assistant to the Sheriff as well as the written orders.  [McK. Dep. p. 89, ll. 21 - 23]

6.      **Dispute** – Despite being about two minutes late in transporting two juveniles to court, it was not McKinney's fault.  Although the Sheriff in his Termination Notice did not rely upon this genuine dispute, it is placed here as one of the "four issues" raised showing that McKinney did not meet legitimate employment expectations.  McKinney was following proper procedure by leaving in a timely manner to pick up the juveniles which were reported to him to be at the same location to transport them to court.  It was found out upon arriving at the stated juveniles' location that the second juvenile was at a different facility miles away necessitating extra time for transport.

### Facts

McKinney was assigned to transport two juveniles for a court appearance.  Michelle Jones (Administrative Assistant to the Sheriff) instructed McKinney that the two juveniles were at one place, told him where they were and told him to pick them up and transport  to court by a certain time.  As it turned out, one youth was in one location and the other youth was in another location which necessitated McKinney to make two stops with travel time in between and he was late for court by one minute.  [McK. Dep. p. 78, l. 24 - p. 80, l. 11; p. 81, ll. 1 - 13]

McKinney was counseled indicating that he should always leave plenty of time to make the transport and get the person to court on time.  McKinney's response was that he did have plenty of time if they were in the same place as he was instructed by Michelle Jones and that he can't foresee them being at two different places miles apart.  [McK. Dep. p. 78, l. 24 - p. 80, l.

11; p. 81, ll. 1 - 13]

Sheriff Hodges called McKinney in and talked about the situation with him but no discipline was issued.  [McK. Dep. p. 83, ll. 4 - 11]

7.      **Dispute** – McKinney was not texting while driving on a transport despite that being reported by a fellow officer.  Although the Sheriff in his Termination Notice did not rely upon this genuine dispute, it is placed here as one of the "four issues" raised showing that McKinney did not meet legitimate employment expectations.  McKinney was entering a password in which to access GPS to help him make the transport.  He was not thumbing in text messages to another person while driving.

### Facts

On December 10, 2013, another officer reported that McKinney was texting while driving on a transport.  McKinney informed Sheriff Hodges that he wasn't texting but checking the GPS or putting a password in his phone to get the transport directions.  McKinney was never trained on how to use GPS applications if they were available on the WCSD computer system located in the vehicle.  McKinney affirmed that he was not texting and driving.  All he was doing was putting in his password on his cell phone to get the GPS support for the transport.  [McK. Dep. p. 83, l. 12 - p. 84, l. 25]

Deputy Bailey was talked to about texting and driving based upon a citizen's complaint.  McKinney felt that he was interrogated when he wasn't texting and that Deputy Bailey was actually texting and didn't get any discipline.  [McK. Dep. p. 84, ll. 17 -25]

McKinney was never disciplined, verbally warned or received a written warning for the cell phone incident pursuant to SOP Administration 11 Cellular Telephones III B 1-5.

McKinney was not texting, but only entering a password to get GPS directions to perform a transport.  [App. Ex. 10 and McK. Aff. ¶ 34]

McKinney felt this was another incident where Sergeant Patrick and Chief Deputy Gatton were trying to get McKinney out.  [McK. Dep. p. 85, ll. 14 - 18]

**8.**     **Dispute** – McKinney has met the requirements to state a retaliation claim based upon the fact of engaging in statutorily protected activity, i.e., numerous post-hiring complaints to his supervisor, Sergeant Patrick, Chief Deputy Gatton and Sheriff Hodges.  These complaints were based upon an unlawful employment practice of treating McKinney, as a black, differently than at least Deputy Bailey, who was hired at the same time, because of race.  It is obvious McKinney suffered adverse employment action and there is sufficient direct and circumstantial evidence for a trier of fact to determine that the termination was caused by McKinney's opposition to the unlawful employment practice.

### Facts

There was no training program for McKinney.  He had completed several classes and had a number of deputies assigned to him including Sergeant Patrick.  He initially spent a lot of time around the WCSD facility with not a lot to do.  Due to the lack of training, McKinney actually just sat around for awhile at the WCSD facility and sat down, inactive in dispatch for hours.  He did not believe he was trained.  If McKinney had a question, they would answer it but there was no training program for him.  [McK. Dep. p. 34, l. 2 - p. 36, l. 14; & p. 52, l. 9 - p. 53, l. 5]

McKinney's lack of training and assignments to ride with other deputies left him at the WCSD sitting around doing nothing and having no real responsibilities unlike deputy Kory Bailey.  [McK. Aff. ¶ 16]

15

The training received by Deputy Bailey, the merit officer hired the same time as McKinney, was different.  Deputy Bailey rode with a different deputies most of the time and was actually active during traffic stops and other law enforcement activities while McKinney did transports much of the time.  [McK. Dep. p. 35, ll. 13 - 24]

There was no training policy manual or training procedures made known to McKinney. McKinney had neither classroom training nor training through manuals.  [McK. Dep. p. 36, ll. 1 - 8 & p. 42, ll. 21 - 23]

McKinney, if he was with another deputy, would sometimes be required to hang out at the deputy's house while on duty during a shift also including attending fish fries.  [McK. Dep. p. 36, ll. 9 -16]

McKinney talked to Sheriff Hodges indicating his frustration about only doing transports and not learning traffic stops and some of the other things.  McKinney rode with the Sheriff Hodges for one day only and he apologized for not having a better training policy or manual. McKinney complained to the Sheriff Hodges that he was not doing anything and not getting trained.  [McK. Dep. p. 37, ll. 1 - 19]

When Kinney rode around with Sergeant Patrick, he wasn't comfortable because as they were in the car driving around and there was no conversation.  [McK. Dep. p. 37, l. 20 - p. 38, l. 11]

When McKinney had involved with his first crash report, he had no training in handling such and was told to go downstairs at WCSD and ask any questions if he had any.  [McK. Dep. p. 43, l. 24 - p. 44, l. 16]

16

As McKinney's probationary period went on, he talked to Sheriff Hodges about the lack of training that he was receiving from Sergeant Patrick who was his predominant training officer. [McK. Dep. p. 46, ll. 11 -20]

One of the incidents involving the lack of training with Sergeant Patrick was while on duty during his shift and while he was supposedly training McKinney, Sergeant Patrick took McKinney to his girlfriend's house for a couple hours and they watched basketball games. [McK. Dep. p. 51, ll. 13 - 25]

McKinney felt very uncomfortable in the presence of Sergeant Patrick during training and during his shift while on duty and by using a county car with county gas to drive to his girlfriend's house for two hours.  [McK. Dep. p. 54, ll. 13 - 25]

McKinney could not go to his first-line leader and the person he spent the most time with, what little time he spent in training, which was Sergeant Patrick.  McKinney did not feel comfortable talking to Chief Deputy Gatton because he didn't feel comfortable with him.  [McK. Dep. p. 59, ll. 2 - 11]

The next incident that made McKinney feel that his race was involved the mirror damage to his commission vehicle.  At that point in time, McKinney had had no training on accidents and didn't think he had even done an accident report yet.  [McK. Dep. p. 68, l. 18 - p. 69, l. 13]

McKinney felt the 40-hour pre-basic class that Chief Deputy Gatton did not give him was neglect from the very get go.  [McK. Dep. p. 71, ll. 1 - 13]

McKinney had no specific training on the specific Standard Operating Procedures ("SOPs").  [McK. Dep. p. 76, ll. 1- 5]

**9.**     **Dispute** – McKinney has presented numerous incidences of what appear to be direct evidence of disparate treatment.  He has also laid out a convincing mosaic of circumstantial evidence, when pieced together, also demonstrates intentional discrimination by disparate treatment.

**Facts** – The facts set forth Dispute No. 8 are incorporated by reference.

McKinney did not believe that reference raised by a person other than him in that final pre-employment interview was discriminatory at that time.  However, it later became clear that it was a problem and it appeared that McKinney's race was causing him negative employment issues.  [McK. Dep. p. 30, ll. 2 - 7]

Kory Bailey was also hired at the same time as McKinney and he was a full-time merit officer and was Caucasian. [McK. Dep. p. 32, l. 14 - p. 33, l. 2]

In February of 2014, McKinney's salary was increased in excess of $2,000.00 per year and he received no employee review evaluation.  [McK. Aff. ¶ 7]

McKinney was discharged pursuant to a Termination Notice from Sheriff Mark Hodges to McKinney dated May 16, 2014 [Ex. A].  McKinney later received on May 19, 2014 a letter confirming the discharge from the Whitley County Board of Commissioners [Ex. B]. [McK. Aff. ¶ 8]

At the time McKinney was hired, Sheriff Hodges had decided he would not run again for Sheriff of Whitley County and his term would end on or about December 31, 2014.  Chief Deputy Gatton was the successor and began to become the defacto Sheriff during 2014. [McK. Aff. ¶ 9]

There were indicators early on after McKinney commenced employment that did point towards a discriminatory attitude at WCSD.  The first indicator was right after McKinney started – within a week or two.  [McK. Dep. p. 30, ll. 3 - 7]

Chief Deputy Gatton may have been involved in the hiring process.  Sheriff Hodges was one of the people that would have been involved in the termination decision.   [McK. Dep. p. 102, l. 14 - p. 103, l. 22]

The decision to terminate McKinney was influenced by Sergeant Cory Patrick and Chief Deputy Gatton because they were the individuals that had the McKinney information and would report to Sheriff Hodges and could tell him, "Hey, this guy is a good soldier or bad soldier." Sheriff Hodges would have been relying on Sergeant Patrick and Chief Deputy Gatton when he ultimately made his decision to terminate McKinney.  [McK. Dep. p. 104, l. 1 - p. 105, l. 19]

The decision to discriminate against McKinney because of his skin color was a collective decision and effort with Sergeant Patrick, Chief Deputy Gatton and Sheriff Hodges. [McK. Dep. p. 105, ll. 5 - 19]

There was never any evaluation in McKinney's personnel file or any proper training documentation when all the other deputies had theirs in their personnel files.  [McK. Dep. p. 107, ll. 1 - 16]

McKinney had at least one incident with Sergeant Patrick where McKinney complained to Sheriff Hodges about the negative treatment he received from him and Sheriff Hodges indicated he would talk to him.  [McK. Dep. p. 132, l. 14 - p. 133, l. 11]

McKinney never recalls any situation in which he told the dispatcher that he could not perform tasks as instructed.  He is not that kind of person.  [McK. Dep. p. 109, ll. 7 -23]

19

The negative kind of treatment from Sergeant Patrick was different than received by other deputies in the WCSD such as Tim Johnson, Lauren Schmidt and John Stoffel.  [McK. Dep. p. 133, ll. 12 - 25]

There were other times that McKinney felt uncomfortable at the WCSD while being the only black employee ever in the history of the Whitley County Sheriff's Department.  For example, when he walked into a group of employees in a room and tried to converse with anyone, no one would talk to him.  [McK. Dep. p. 56, ll. 22 - 25]

One uncomfortable incident because of his race threw McKinney off when he was riding with Deputy Schmidt and they were at McDonald's ordering coffee.  Schmidt told him that he was going to come up to the server while ordering and say, "I was gonna tell 'em I want my coffee black like my partner."  [McK. Dep. p. 57, l. 21 - p. 58, l. 15]

McKinney did not report the statements to his supervisors because he already felt that they were trying to "terminate me."  [McK. Dep. p. 59, l. 6 - p. 60, l. 1]

At one point in time soon thereafter, McKinney wanted other people to hear Deputy Schmidt make the same black comment related to coffee including a waitress at another restaurant.  [McK. Dep. p. 61, l. 9 - p. 62, l. 8]

Another issue involving race occurred in the second week after McKinney was hired. Sheriff Hodges told McKinney that he and his wife should watch the movie "42" about Jackie Robinson.  He stated that you and your wife should go to Redbox, sit down and rent the movie. It will help you out.  There is a verbal order directly by Sheriff Hodges for McKinney and his white wife to watch the movie about racism.  [McK. Dep. p. 64, ll. 8 - 22; p. 65, ll. 2 -14; & p. 106, ll. 13 -25]

20

In another incident Deputy Schmidt used the word "nigger" in the presence of McKinney and it rubbed him the wrong way.  [McK. Dep. p. 66, ll. 1 - 22]

This was not reported to Sheriff Hodges or Chief Deputy Gatton because McKinney felt he was already a target and why would he put gas on the fire.  [McK. Dep. p. 66, l. 23 - p. 67, l. 3]

He believed Chief Deputy Gatton was upset because he refused to give the 40-hour pre-basic class to McKinney.  All Chief Deputy Gatton did was give McKinney a thumb drive and told him to take the test.  [McK. Dep. p. 67, ll. 4 - 22]

When McKinney and his wife attended the Sheriff's Christmas party, no one talked to us. It was like we walked into the room and time was frozen and everybody looked at us and nobody talked to us.  [McK. Dep., p. 133, l. 25 - p. 134, l. 7]

Sergeant Cory Patrick, McKinney's supervisor, was a personal friend of Chief Deputy Gatton and served together at the WCSD for many years.  [McK. Aff. ¶ 10]                    29.

The persons with the most involvement because of the amount of personal contact and information in getting rid of McKinney were Sergeant Patrick and Chief Deputy Gatton.  [McK. Dep. p. 96, ll. 1 -9; McK. Aff. ¶ 11]

Virtually all of the communications involving issues and incidences and related discussions concerning discipline/counseling involving McKinney were with Sergeant Cory Patrick and/or Chief Deputy Gatton.  There was very little direct communication as to the various issues, including those relied upon in the Termination Notice as well as the other issues delineated by the Defendants that were directly discussed with Sheriff Hodges.  Thus, nearly all of the knowledge relating to McKinney as to the facts relating to the incidences were within the

21

possession and control of Sergeant Patrick and Chief Deputy Gatton.  Thus, Sheriff Hodges termination decision could only be based upon information relayed by Sergeant Patrick and Chief Deputy Gatton.  [McK. Aff. ¶ 12]

Of the three cumulative issues used as the basis for termination by Sheriff Hodges plus the additional two issues not relied upon by Sheriff Hodges but set forth in the Whitley County Commissioner's Letter, all five of those were basically handled through Sergeant Patrick and Chief Deputy Gatton.  [McK. Aff. ¶ 13]

It later became clear soon after his final pre-employment interview that the reference to McKinney being black/African-American was a problem and that his race was going to cause him negative employment issues.  McKinney did not believe that reference raised by a person other than him was discriminatory initially.  However, it later became clear that it was a problem and it appeared that McKinney's race was causing him negative employment issues. [McK. Aff. ¶ 14]

After McKinney commenced employment with WCSD, the standing joke around the WCSD was that he had been pulled over at gunpoint as a theft suspect and yet still got hired. [McK. Aff. ¶ 15]

There were two (2) incidents showing preferential treatment involving white merit officers; Vogely, who was allowed to retire after he received a DUI as a deputy; and Geist, who had multiple issues with pain medications and he wasn't fired and was able to resign.  [McK. Dep. p. 145, l. 12 - p. 146, l. 11]

Other white deputies were disciplined less severely then McKinney.  McKinney was ultimately fired when white deputies were only suspended for actual violations – Renneker and

Lacotta and Deputy Bailey shooting another officer with a taser only got a written warning.

Tony Helfrich had multiple citizens' complaints and use of excessive force – no termination.

Vogely was only given a 60-day suspension for a DUI but then he eventually quit.  [McK. Dep.

p. 150, l. 24 - p. 151, l. 12 and App. Ex. 13]

      The other specified incidences of more favorable treatment of other deputies involved in

matters that violated rules and regulations of Whitley County and WCSD, although being

similarly situated to McKinney, were:  (a) Chuck Vogely – DUI, in violation of Merit Board

Rules and Regulations 4-2.3; (b) Scott Geiss – misuse of pain medication, in violation of Merit

Board Rules and Regulations 4-2.3; (c) Linda l/n/u – accidental discharge of weapon and

prisoner escape due to her negligence; (d) Jason Spencer – inappropriate personal relationship

with staff at WCSD, in violation of Merit Board Rules and Regulations 4.2.3; and (e) Tony

Helfrich – citizens' complaints of excessive use of force, refusal to do a transport as instructed,

commissioned vehicle accidents, defendant in multiple tort/civil lawsuits, in violation of Merit

Board Rules and Regulations 4.2.3 and 4.4.3.  [McK. Aff. ¶ 35 and App. Ex. 13]

      McKinney, with respect to monthly activity reports, was never informed by SOP or by

order from Sergeant Patrick or Chief Deputy Gatton to fill out the one missing monthly activity

report until four days prior to his termination.  There is no SOP for such monthly activity reports

while attending ILEA in any manual or policy given to McKinney.  [App. Ex. 8 and McK. Aff. ¶

29]

      Plaintiff's Interrogatory No. 15:  "Identify the SOP that governs the filling out of a

completion of a monthly activities report for each officer of the Defendant while attending the

Indiana Law Enforcement Academy [" ILEA"] academy within the last four (4) years and

23

identify each person who made entries, filled out or completed such monthly activities of the report." The first sentence in the Answer to the Interrogatory is, "There is no SOP that governs this activity." [McK. Dep. p. 138, l. 8 - p. 139, l. 7 and App. Ex. 8]

McKinney went to the ILEA starting on March 31, 2014. The WCSD stated that there was an SOP that required an attendee such as McKinney at ILEA to complete a monthly activity report. [McK. Dep. p. 94, ll. 9 -24 - p. 95, l. 25]

McKinney was never told he had to fill out a monthly activity report while at ILEA. McKinney, upon being informed that such monthly activity report was to be completed, did such within an hour. It was the only such report that had to be filed or was due. [McK. Dep. p. 94, l. 25 - p. 95, l. 5]

The Standard Operating Procedure Enforcement 06 – Crashes Involving Department Vehicles III B. 1. a. states the follow: "All such crashes shall be investigated at the scene, as soon as possible, unless an emergency or other justifiable reason causes a delay." [App. Ex. 4 and McK. Aff. ¶ 24]

Also, McKinney did not violate any SOP – Enforcement 06 involving an accident with his commission vehicle by failing to keep it at the scene and call another officer to make a report because there is an exception in the SOP when an officer has pressed an emergency button and could be in trouble. Since deputy Bailey's emergency button went off indicating an emergency involving him as an officer down or in trouble then deputies with a damaged commission vehicle are not required to wait for another officer to come out and make a report but you respond to help your fellow officers. [McK. Dep. p. 73, l. 2 - p. 74, l. 6]

24

Deputy Bailey not only tore the bumper off of his commission vehicle and was presented it as a gift at the Christmas party without disciplinary action, he went 3,000 miles over his first oil change deadline and received no disciplinary action.  [McK. Dep. p. 96, l. 18 - p. 97, l. 6]

McKinney was assigned to transport two juveniles for a court appearance.  Michelle Jones (Administrative Assistant to the Sheriff) instructed McKinney that the two juveniles were at one place, told him where they were and told him to pick them up and transport  to court by a certain time.  As it turned out, one youth was in one location and the other youth was in another location which necessitated McKinney to make two stops with travel time in between and he was late for court by one minute.  [McK. Dep. p. 78, l. 24 - p. 80, l. 11; p. 81, ll. 1 - 13]

McKinney was counseled indicating that he should always leave plenty of time to make the transport and get the person to court on time.  McKinney's response was that he did have plenty of time if they were in the same place as he was instructed by Michelle Jones and that he can't foresee them being at two different places miles apart.  [McK. Dep. p. 78, l. 24 - p. 80, l. 11; p. 81, ll. 1 - 13]

On December 10, 2013, another officer reported that McKinney was texting while driving on a transport.  McKinney informed Sheriff Hodges that he wasn't texting but checking the GPS or putting a password in his phone to get the transport directions.  McKinney was never trained on how to use GPS applications if they were available on the WCSD computer system located in the vehicle.  McKinney affirmed that he was not texting and driving.  All he was doing was putting in his password on his cell phone to get the GPS support for the transport.  [McK. Dep. p. 83, l. 12 - p. 84, l. 25]

25

Deputy Bailey was talked to about texting and driving based upon a citizen's complaint. McKinney felt that he was interrogated when he wasn't texting and that Deputy Bailey was actually texting and didn't get any discipline.  [McK. Dep. p. 84, ll. 17 -25]

In December of 2013, the WCSD had another issue involving a transport in which McKinney was involved.  McKinney completed the transport orders as written and as instructed. He transported a prisoner from Westville correctional facility to the WCSD facility, then he went to Plainfield correctional facility and picked up another prisoner and transported him to the WCSD facility.  McKinney did exactly as he was instructed by the dispatcher in that the dispatcher never indicated that he was supposed to go from Westville to Plainfield and bring both prisoners back to Whitley County.  Exhibit 1 and Exhibit 2 to McKinney's deposition show that McKinney did exactly as the transport orders said.  The WCSD claims that McKinney was instructed to go from Westville to Plainfield and then back to the WCSD facility.  When McKinney brought the prisoner back from Westville, he talked to Michelle Jones, Administrative Assistant to the Sheriff, and was instructed by Sheriff Hodges through Michelle Jones that he had pick up the prisoner in Plainfield.  McKinney indicated he would cancel his dinner plans and transported the prisoner, returned back and was only 30 minutes over his shift for which he got paid.  McKinney spoke to Chief Deputy Gatton specifically about the issue and Gatton instructed McKinney to properly block down the half-hour overtime for which he was paid.  McKinney never refused to get the prisoner in Plainfield and bring him back and strictly followed the instructions as verbally told to him and as in the transport orders.  [McK. Dep. p. 86, l. 4 - p. 90, l. 6 and App. Ex. 6]

McKinney properly transported as both instructed in writing by two written transport orders and orally by the Administrative Assistant to the Sheriff, Michelle Jones, as well as his superiors, Sergeant Patrick or Chief Deputy Gatton [McKinney Dep. Ex. Nos. 1 and 2] which show McKinney signing the transport orders and showing the requirement: [No. 1]  that the prisoner be transported from Westville correctional facility to the "Receiving facility/ institution or agency OTC–Whitley Co.; and [No. 2] transported from STP [Plainfield correctional facility] to "Name of facility or agency transported to parole discharge/Whitley Co–TOT."  McKinney was never informed as he communicated with dispatch during the prisoner transport from Westville correctional facility to the WCSD that he should change route and go directly to Plainfield and pick up the second prisoner and bring both to WCSD at the same time.  SOP requires one officer per prisoner, not one officer per two prisoners.  One of the prisoners was a violent offender and the two prisoners could not be separated in the backseat during transport.  McKinney and the releasing deputy signed the transport orders [App. Ex. 6].  [McK. Aff. ¶ 27]

McKinney received a written warning from Sheriff Hodges despite the fact that he explicitly followed the verbal instructions from the assistant to the Sheriff as well as the written orders.  [McK. Dep. p. 89, ll. 21 - 23]

SOP Administration 20 related to fueling at the WCSD fueling facility which McKinney followed [App. Ex. 2].  As relates to his attendance at ILEA, McKinney prepared an analysis of the gas mileage and range that his commissioned vehicle could have in relation to the use of gasoline credit cards under SOP Administration 20 Use of Gasoline Credit Cards III. A.  That analysis which shows that McKinney could not make a round trip in order to use the county fueling facility in Whitley County on a full tank of gas, let alone a half tank of gas, which

necessitated the use of gasoline credit cards and not filling up on weekends at the county fueling facility [Ex. C].   [McK. Aff. ¶ 18]

McKinney's commission vehicle a/k/a "squad car" averaged approximately 15 miles per gallon when traveling on road mileage.  The gas tank capacity on the commissioned vehicle was 19 gallons which gave McKinney an effect range on one tank of gas of 285 miles.  McKinney could not make a round trip from the WCSD to the ILEA campus and back on one tank of gas. [McK. Aff. ¶ 20]

McKinney inquired as to fuel consumption while attending ILEA.  He was informed to use his credit card to get fuel so that he could fuel up at the county fueling facility.  McKinney told them that you cannot make a round trip to Plainfield and back on one tank of gas so he was informed to use his fueling card and fill up at the county station when he could.  [McK. Dep., p. 98, l. 24 - p. 99, l. 23]

McKinney was specifically instructed by Sergeant Cory Patrick, Deputy Scott Schmidt, Chief Deputy Gatton and Sergeant Todd Cook that the fuel tank on his commission vehicle should be kept at one-half tank is possible, due to the need to react to emergencies and be involved in police chases.  [McK. Aff. ¶ 22]

Many other deputies used the WCSD gasoline credit cards while at the ILEA, the same as McKinney.  [McK. Dep. p. 136, ll. 5 - 12]

WCSD claimed there was an SOP requiring use of the Whitley County fueling facility on weekends – but there was no such SOP.  [ McK. Dep. p. 95, ll. 22 - 25]

In McKinney's Termination Notice the WCSD went through each 10-hour day time report indicating that McKinney had violated the policy by not clocking out for lunch.

McKinney did not indicate that he was clocking out because you are at the academy – you do everything at the academy and you don't leave.  Therefore, you are not clocking out for lunch and he was never told to deduct time for lunch.   [McK. Dep. p. 101, ll. 1 - 25]

The Sheriff of Whitley County's Answer to Plaintiff's Interrogatory No. 13 specifically requested to identify the standard operating procedure that determines the policies and calculation of compensable and non-compensable time while an officer attends the Indiana Law Enforcement Academy within the last four (4) years.  The Answer said, "There is no standard operating procedure regarding..."   [McK. Dep. p. 137, ll. 8 - 22 and App. Ex. 8]

All of the time records produced by the WCSD never indicated any other deputy attending ILEA clocked out.  All of the white deputies put in for 10-hour days and didn't have to clock out but McKinney had to and was told the time sheet entries were wrong.  [McK. Dep. p. 101, ll. 15 - p. 102, l. 1 and p. 107, ll. 1 - 16]

Based on the WCSD Answer to Interrogatory No. 12, Chief Deputy Gatton filled out McKinney's time sheets.  [McK. Dep. p. 147, l. 20 - p. 148, l. 21; and App. Ex. 8]

The Whitley County Government Policy Manual 3.6 prohibits anyone but the employee from filling out time on the Employee's Service Record.  However, Chief Deputy Gatton did such for McKinney as well as other officers before and after McKinney.  [App. Ex. 8 & 9 and McK. Aff. ¶ 33 and Ex. F]

McKinney talked to both Chief Deputy Gatton and the Sheriff about how to mark down the time to be put on the time sheet and was told to calculate his hours and send them in.  [McK. Dep. p. 149, ll. 1 - 13]

The other deputies who did not have to clock out for lunch while at the academy were Billy Maddox, Dustin Auer and Brandon Smith.  At least one of them attended before McKinney was at the ILEA and one of them was after he was at the ILEA.  [McK. Dep. p. 101, l. 23 - p. 102, l. 6]

Deputy Dustin Auer was paid on a ten-hour day while attending ILEA as was deputy Brandon Smith and deputy Billy Maddox and all are still employed with WCSD.  [McK. Aff. ¶ 32]

While attending the ILEA, McKinney asked for advice as to how to properly report his work hours both from Michelle Jones, Administrative Assistant to the Sheriff, as well as Chief Deputy Gatton.  He was informed by email from Jones to put down ten hours each day without deductions for breakfast or lunch [Ex. D].  On May 13, 2014, Chief Deputy Gatton emailed McKinney stati ng, "Authority Sheriff Hodges will get paid 40 hours a week for now.  He is doing some research and will go back with you."  On May 12, 2014, Jones in a response email told McKinney, "I will work on this.  In the past it has been 10 hours 4 days a week."  [Ex. D]. [McK. Aff. ¶ 31]

Sheriff Hodges told McKinney while attending ILEA to "just keep your time.  He said its ten-hour days.  Any time you do outside the ten hours, just blot down on your time and send it to me."  McKinney checked with Sheriff Hodges after about four weeks of attending ILEA by text and asking if he was doing alright and Sheriff Hodges responded, "Yep, just keep doing what you're doing."  [McK. Dep., p. 97, l. 25 - p. 98, l. 10]

McKinney was told that he was going to get ten-hour days by Sheriff Hodges and other deputies at WCSD.  Ten-hour days yet McKinney sent in such time and was terminated for not

30

clocking out for breakfast and lunch.  The time records produced by WCSD showed no white deputies clocking out for lunch while at ILEA and no discipline while McKinney was terminated for such.  These deputies were Billy Maddox, Dustin Auer and Brandon Smith.  [McK. Dep., p. 100, l. 22 - p. 101, l. 25]

Chief Deputy Gatton told McKinney upon his inquiry about documenting work hours prior to attending the ILEA – "Just mark down 10 hours."  [McK. Aff. ¶ 30]

**10.     Dispute** – McKinney was subject to arrest and excessive force during the traffic stop by Deputy Helfrich, who has a history of citizen's complaints of excessive force.

**Facts**

McKinney was taking his refrigerator in his truck to Sears when he noticed deputy Helfrich's squad car going in the same direction as he was.  McKinney pulled over to the right, slowed down, so deputy Helfrich could pass him.  Thereafter, deputy Helfrich turned around with lights and siren on and McKinney had already stopped his truck.  McKinney had no idea what deputy Helfrich was going to do other than possibly talk to him.  Deputy Helfrich told McKinney to turn his car off, put the keys on top of the truck and "ordered me outta the car." Deputy Helfrich was pointing his gun at McKinney after he got out.  McKinney was very scared and had no idea what this was all about.  McKinney was ordered to lay on the ground, cross his legs and he was handcuffed in the middle of the road.  When deputy Helfrich handcuffed him, he got on top of McKinney who was face down on the ground.  McKinney was in shock and, when he was instructed by deputy Helfrich to get up, he was pulled up by the handcuffs which were behind his back.  McKinney was detained for a certain amount of time but he didn't remember exactly how long – maybe two or three minutes.  [McK. Dep. p. 111, l. 20 - p. 115, l. 13;

Defendants' Memorandum Ex. 6 & 7]

When McKinney was originally handcuffed face down in the middle of the road, he was at the side of his truck and then they moved to the back of the truck.  [McK. Dep. p. 116, ll. 1 - 6]   McKinney, who weighs 200 pounds, was pulled up by his handcuffs and it hurt him when he was pulled up and it hurt him when he was handcuffed and he felt the knee or other part of the body in his back when he was being handcuffed and it was uncomfortable.  [McK. Dep. p. 142, l. 12 - p. 143, l. 22]

The arrest and handcuffing incident affected McKinney by creating psychological problems and it affected McKinney "big time."  It makes McKinney nervous.  McKinney has had to have counseling and because of this situation has taken medication called Zoloft at times under a doctor's prescription.  [McK. Dep. p. 117, l. 25 - p. 120, l. 11]

**VEGELER LAW OFFICE LLC**

By:_____/s/ Robert Owen Vegeler_____
        Robert Owen Vegeler (0947-02)
        110 West Berry Street, Suite 1200
        Fort Wayne, Indiana 46802
        Ph:     (260) 407-6161
        Fax:    (260) 407-6160
        robert@vegelerlaw.com
        Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of September, 2016, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Julie J. Havenith, Esq.
TRAVELERS STAFF COUNSEL OFFICE
707 E. 80th Place, Suite 100
Merrillville, IN 46410
Attorney for Defendants

/s/ Robert Owen Vegeler
Robert Owen Vegeler