UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

TERRANCE S. MCKINNEY            )
                               )
        Plaintiff,             )
                               )
    v.                         )    CIVIL NO.  1:15cv79
                               )
THE OFFICE OF THE SHERIFF OF   )
WHITLEY COUNTY, INDIANA, *et al.* )
                               )
        Defendants.            )

OPINION AND ORDER

This matter is before the court on a motion for summary judgment filed by the

defendants, the office of the Sheriff of Whitley County, Indiana ("the Sheriff") and Tony Helfrich

("Deputy Helfrich"), in his official capacity of deputy sheriff and his individual capacity, on

August 5, 2016.  The plaintiff, Terrance S. McKinney ("McKinney"), filed his response on

September 7, 2016 to which the defendants replied on September 21, 2016.

For the following reasons, the motion will be granted.

Discussion

Summary judgment must be granted when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine

issue of material fact exists when "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Not every dispute between the parties precludes summary judgment, however, since "[o]nly

disputes over facts that might affect the outcome of the suit under the governing law" warrant a

trial. Id. To determine whether a genuine issue of material fact exists, the court must construe all

facts in the light most favorable to the non-moving party and draw all reasonable inferences in

that party's favor. <u>Heft v. Moore</u>, 351 F.3d 278, 282 (7th Cir. 2003). A party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in its own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." <u>Goodman v. Nat'l Sec. Agency, Inc.</u>, 621 F.3d 651, 654 (7th Cir. 2010).

McKinney, who is African American, has sued his former employer, the Sheriff of Whitley County, alleging race discrimination and retaliation, pursuant to Title VII of the Civil Rights Act of 1964, as amended. Additionally, McKinney alleges claims of unlawful seizure and excessive force, as well as violation of the Equal Protection Clause, brought pursuant to 42 U.S.C. § 1983. McKinney has also brought state law claims for intentional infliction of emotional distress and battery.[1]

The following facts are pertinent to the motion for summary judgment. Former Whitley County Sheriff Mark Hodges hired McKinney as a full-time merit officer in August of 2013. (Affidavit of Mark Hodges, par. 1; deposition of Terrance McKinney, p. 26, ll. 5-11.) As he was going through the application process, McKinney was not aware of any hesitation that anyone had in hiring him as a merit officer. (McKinney Dep., p. 33, ll. 10-13.) McKinney was required to complete a one year probationary period, as are all merit officers under I.C. 36-8-10-10, during which Sheriff Hodges had the sole discretion to terminate his employment without the approval of the merit board under Merit Rules # 1-2.3 and 3-1.7. (Hodges Aff., par. 2;  Merit Rules # 1-2.3

---

[1]  With regard to McKinney's claim that defendants violated his rights under the Indiana State Constitution, there is no express or implied private right of action for monetary damages under the Indiana Constitution. *Gaff v. Indiana-Purdue University of Fort Wayne*, 45 N.E.3d 458 (Ind.Ct.App. 2015.) McKinney has no cause of action under the Indiana State Constitution.

and 3-1.7); I.C. 36-8-10-10. The probationary period is intended to determine if an officer is capable of performing the duties of a merit officer and to determine if there are any concerns with the officer's ability to perform such duties. (Hodges Aff., par. 3.)

McKinney had multiple issues during his probationary period which allegedly lead to the Sheriff's decision to terminate his employment. (Hodges Aff., par. 4.) McKinney had two chargeable accidents with his County squad car, one of which he did not report from the scene as required by the Whitley County Sheriff's Department Standard Operating Procedures so that another officer could come to the scene to complete a report; rather, he drove the squad to the station and then reported the accident. (*Id.*, par. 5.) McKinney was given a verbal warning for failing to timely report this accident. (*Id.*) Additionally, on October 15, 2013, McKinney was late taking juveniles to Court for an appearance. (*Id.*, par. 6.)

Next, on December 10, 2013, a fellow officer reported that she observed McKinney texting while driving on a transport. (*Id.*, par. 7.) When Sheriff Hodges asked Plaintiff about this report, he responded that he was not texting but that he may have been either checking his GPS or putting in his password; regardless, he admitted to using his phone while driving which is contrary to the Department's SOPs and is extremely unsafe. (*Id.*)

Next, in December of 2013, McKinney was ordered to drive from Columbia City, Indiana to the Westville Correctional Facility and pick up a prisoner, and then go from Westville to Plainfield Correctional Facility for another prisoner transport. (*Id.*, par. 8.) He first asked to make the trip in the reverse order, but was told that he could not. (*Id.*) He then made the transport from Westville, but never went to Plainfield. (*Id*). When he was asked why he did not go to Plainfield, he stated that the transport from Westville took too long and he had family plans that evening.

(*Id.*) He did not contact anyone with the Sheriff's Department to obtain permission to disregard the transport order. McKinney was given a written warning for not carrying out the transport order. (*Id.*) Finally, while McKinney was at the Indiana Law Enforcement Academy (ILEA), he did not turn in his monthly report as required by the Whitley County Sheriff's Department SOPs, he reported his time at the Academy incorrectly and failed to fuel up at the County fueling station during his weekends home as required by the SOPs and instead used his County credit card. (*Id.*, par. 9.) Based on the above instances of problems during his probationary period, Sheriff Hodges determined that McKinney was not suited for performing the duties of a merit officer and terminated his employment effective May 16, 2014. (*Id.*, par. 10.)

Sheriff Hodges states in his affidavit that he had previously terminated a male Caucasian probationary merit officer in 2008 because, similar to McKinney, he had repeated issues with performance that caused him concern. (*Id.*, par. 11.) These included failing to respond appropriately to a personal injury accident, taking longer than required to respond to a residential alarm, failing to include a witness in a written report of an OWI arrest, failing to appropriately follow through on investigations, failing to respond immediately to a call for assistance in the jail, failure to properly complete a jail record for a court, and failing to obtain proper approval for overtime. (*Id.*) Sheriff Hodges previously terminated another male Caucasian Transport Officer for repeated problems with performance, including being late to work, allowing contact between inmates and their families and friends in court, and speeding in a Department vehicle without authorization. (*Id.*, par. 12.) Sheriff Hodges also previously terminated three male Caucasian Confinement Officers. (*Id.*, par. 13.) One was terminated in 2009 for dispensing improper medication to an inmate, another was terminated in 2010 for two instances of sexual harassment,

and the third was terminated in 2014 for three instances of policy violations. (*Id*., pars. 13-14.) Sheriff Hodges also previously terminated a female Caucasian dispatcher for repeated violations of policies and procedures, including sending an ambulance to the wrong location three times. (*Id*., par. 15.) Hodges states that McKinney's race was not a factor in his decision to terminate McKinney's employment. (*Id*., par.16.)

During his probationary year, McKinney went through a taser class, combatives and firearms training, drug interdiction training and was assigned multiple officers whom he rode with throughout the initial portion of his time with the Whitley County Sheriff's Department. (McKinney Dep., p. 34, ll. 2-22.) McKinney was given eight hours of firearms training in person by Chip Stevenson and eight hours of defensive tactics training in person by Justin Blake. (*Id*., p. 127, l. 24-p. 128, l. 9.) McKinney was then given a thumb drive and looked at PowerPoint presentations and realized "it was all stuff I knew." (*Id*., p. 70, p. 9-p. 71, l. 5.)

McKinney took and passed the test and received a certification for completing the 40 hour pre-basic class. (*Id*., p. 71, ll. 5-18.) Kory Bailey, whom McKinney claims is a similarly situated white employee, had the certification before he came to the Whitley County Sheriff's Department, so he did not need the 40 hour pre-basic class.(*Id*., p. 67, l. 23-p. 68, l. 2.) McKinney also attended the Indiana Law Enforcement Academy during his one year probationary period. (*Id*., p. 33, ll. 14-19.) McKinney was given the Sheriff Department's SOPs, merit board rules and the Whitley County Government policy manual in the first week of his employment and was told by Sheriff Hodges to look through them. (*Id*., p. 41, l. 7-p. 42, l. 20.) When McKinney talked to Sheriff Hodges about feeling that he was not getting enough training in traffic stops, Sheriff Hodges personally took McKinney out to run some traffic stops and switched him to a different

field training officer. (*Id.*, p. 37, l. 1-p. 38, l. 16.) McKinney states that he learned a lot when he rode with officer Billy Maddox during training, who is a "great guy" and McKinney enjoyed riding with him. (*Id.*, p. 55, ll. 11-18.) McKinney also testified that officer Brandon Smith was good to him when he rode with him during training. (*Id.*, p. 55, ll. 11-20.) McKinney feels that Cory Patrick, the officer that he was predominantly with, did not train him; however, McKinney testified that he cannot say that the lack of training was because McKinney is African American. (*Id.*, p. 55, l. 24-12.)

McKinney was allowed to go out on traffic stops on his own shortly before he went to the Indiana Law Enforcement Academy. (*Id.*, p. 39, l. 4-p. 40, l. 6.) McKinney never reported to his supervisors any comments, jokes, statements, use of a racial slur or anything that made him feel uncomfortable during his time at the Sheriff's Department. (*Id.*, p. 57, l. 23-p. 59, l. 19; p. 66, ll. 2-25.)

On July 6, 2013, the Whitley County Sheriff's Department received a 911 call reporting that a green Ford Ranger driven by a black male northbound on CR 800E was carrying a stolen refrigerator from a house under construction. ( CAD report; CD containing 911 audio.) The caller provided his name, phone number, and his place of employment.  The caller stated that he had seen the Ranger drive by previously, and then return to the house with a purple Saturn. (*Id.*) The caller stated that as he was calling, the Ranger and Saturn were at the house and preparing to leave. (*Id.*) The caller stated that the owner of the house was "Terrance." (*Id.*) The caller stated that he knew the homeowners of the house where the refrigerator was being taken from because he had put in the wiring for the house, and that he did not recognize the people taking the refrigerator and believed that it was being stolen. (*Id.*)

Deputy Helfrich responded to the call. At that time, McKinney was driving his truck northbound on CR 800E with a refrigerator in it on his way to Sears. As he was driving, he noticed a police car coming and pulled over to the right so the car could pass him. (McKinney Dep, p. 112, ll. 5-8.) The police officer, Deputy Helfrich, then turned around and approached McKinney's vehicle. (*Id*., p. 112, ll. 8-14.) McKinney did not know Deputy Helfrich at this time, and Deputy Helfrich did not know McKinney. (McKinney Dep., p. 112, ll. 15-20.) Deputy Helfrich told McKinney to turn his car off and put the keys on top of the truck, and ordered McKinney out of the truck. (*Id*., p. 112, ll. 22-24.) McKinney claims that he exited the truck and there was a gun pointed at him. (Id., p. 112, l. 25-p. 113, l. 1.) McKinney claims that Deputy Helfrich ordered him to lay on the ground, cross his legs, and then handcuffed him. (*Id*., p. 113, ll. 7-8.) Deputy Helfrich then ordered McKinney to get up and asked him where he got the refrigerator. (*Id*., p. 113, ll. 9-10.) McKinney testified that Deputy Helfrich did not push Plaintiff on the ground or physically put him down on the ground. (*Id*., p. 113, ll. 19-21.) McKinney admits that he would refer to the video of the stop to show how he was handcuffed. (*Id*., p. 113, l. 21-p. 114, l. 5.) This video, which is in evidence, has been reviewed by the Court.

McKinney testified that he was detained for two or three minutes, and then Deputy Helfrich realized that it was McKinney's refrigerator in the truck, took the handcuffs off and let McKinney go. (*Id*., p. 115, ll. 9-17.) A video of the stop shows that McKinney was handcuffed for approximately three minutes, while Deputy Helfrich looked at paperwork obtained from McKinney's truck. (Defendant's Ex. 6, video at 11:42-11:45.) According to McKinney, Deputy Helfrich told him that they had received a call saying that he was stealing a refrigerator and that was why he was pulled out of the car at gun point. (Defendant Ex. 5, no. 16.) McKinney states

that, having been a law enforcement officer, if he received a call of somebody having stolen a

refrigerator and it being in a pickup truck and saw himself in a pickup truck with a refrigerator,

he would stop the person. (McKinney Dep., p. 124, ll. 16-23.)  McKinney alleges in his

Complaint that Deputy Helfrich's acts of pointing a gun at him, handcuffing him, pulling him up

by his handcuffs and detaining him for an "amount of time" constituted excessive force. (*Id.*, p.

115, ll. 4-8.)

In support of their motion for summary judgment, the defendants first argue that

McKinney has failed to support his claim that his termination was an act of racial discrimination.

A plaintiff seeking to prove discrimination may either offer direct or circumstantial evidence of

discrimination or provide indirect evidence through the framework articulated in *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973.) To succeed under the direct

method, McKinney must offer either direct evidence that would prove the fact in question—the

discriminatory intent—without reliance on inference or presumption, or "a convincing mosaic"

of circumstantial evidence that would allow a jury to infer intentional discrimination by the

decisionmaker. *Silverman v. Board of Educ. of City of Chicago*, 637 F.3d 729, 734 (7th Cir.

2011.)

Under the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411

U.S.792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a plaintiff must first establish a prima facie

case of discrimination by demonstrating that (1) he is a member of a protected class; (2)

he met his employer's legitimate job expectations; (3) he suffered an adverse employment action;

and (4) similarly situated employees outside of the protected class received more favorable

treatment. *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 885 (7th Cir. 2012.) If the plaintiff

establishes a prima facie case of discrimination, the burden then shifts to the employer to offer a

non-discriminatory reason for the adverse employment action. *Id.* If the employer does so, the

burden shifts back to the plaintiff to submit evidence demonstrating that the employer's

explanation is a pretext. *Id.*

In the present case, the defendants contend that McKinney's claim that he was terminated

because of his race fails under either the direct or indirect method of proof. The defendants note

that McKinney has pointed to no direct evidence of racial discrimination. When specifically

asked in interrogatories to explain how he would establish this claim, McKinney responded as

follows:

> INTERROGATORY NO. 15: Identify each and every document, fact or witness
> that Plaintiff will use to prove the allegations contained in Plaintiff's Complaint
> and how such document, fact or witness proves said allegations.
>
> ANSWER: Objection – Interrogatory Answers are not intended to specify in
> detail the parties' case theory and trial evidentiary process.
>  Fuel receipts, timesheets, monthly reports, video recordings, audio recordings,
> SOP's, emails, Commission GPS records, Accident records, Taped Dispatch
> recording, officer hard drive data, Credit card receipts, Witness listed from
> Interrogatory No. 19, Personnel Files, etc.

(Defendants' Ex. 7, no. 15.) Defendants point out that the interrogatory in which McKinney lists

witnesses he would call in this matter, interrogatory number 19, lists numerous witnesses with

broad, vague, general claims of "what they can testify to," but contain no details as to exactly

what each witness will say. Thus, defendants argue that McKinney has not specified any direct

evidence of racial discrimination in his discovery response. Defendants further point out that

many of the witnesses listed are purported by McKinney to be able to testify as to "my

frustrations" or close friends who could testify as to McKinney's own statements to them of

"discriminatory things that took place while employed at the WCSD." (*Id.*) Defendants correctly point out that McKinney does not, anywhere, specify any direct evidence of discrimination.

McKinney asserts in his Memorandum of Law in Response to Summary Judgment that he has presented facts in his Statement of Genuine Issues of Fact which a reasonable trier of fact "could determine includes direct evidence supporting racial discrimination."(Plaintiff's response brief, p. 11.) However, he does not specify which facts would constitute such direct evidence; rather, he points in general to his Statement of Genuine Issues of Fact. On summary judgment, facts are to be set forth in properly submitted Rule 56.1 statements, and it is not the role of the Court to parse the parties' exhibits to construct the facts. Judges are not "like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991). "Nor are they archaeologists searching for treasure." *DeSilva v. DiLeonardi*, 181 F.3d 865, 867 (7th Cir.1999). It is not the Court's job to sift through the record to determine whether there is sufficient evidence to support a party's claim. *Davis v. Carter*, 452 F.3d 686, 692 (7th Cir.2006). Rather, it is "[a]n advocate's job ... to make it easy for the court to rule in his client's favor." *Dal Pozzo v. Basic Machinery Co., Inc.*, 463 F.3d 609, 613 (7th Cir.2006).

McKinney has not directed the Court to which specific facts he believes show direct evidence of discrimination, nor has the Court been able to discern any such facts from the filings. Thus, McKinney has not established direct proof of discrimination and must meet his burdens under the indirect method of proof under *McDonnell Douglas*.

Defendants argue that, under either the direct or indirect method of proof, McKinney's *prima facie* case fails because he was not meeting Defendants' legitimate employment expectations at the time that he was terminated. As discussed above, McKinney had numerous,

documented disciplinary issues during his probationary year. Thus, the defendants conclude that McKinney was not meeting his employer's legitimate expectations.

Clearly, McKinney has not established that his performance met Defendant's legitimate job expectations. The issue with regard to this prong of the *prima facie* case is simply whether McKinney was meeting his employer's expectations at the time of the discharge. *See Anderson v. Stauffer Chemical Co.*, 965 F.2d 397 (7th Cir.1992). In the case at bar, all that McKinney offers is his own assertions that he was meeting Defendant's legitimate job expectations. The Seventh Circuit has held repeatedly that in considering whether an employee has met his or her employer's legitimate job descriptions "as a rule, this court will 'not sit as a super-personnel department that reexamines an entity's business decisions' in cases where discrimination is alleged." *Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1262 (7th Cir. 1993). In *Hong*, much like the present case, Hong attempted to prove that she was meeting her employer's legitimate job expectations by comparing her job performance to her fellow employees, as well as that she was issued harsher discipline than other employees. The Seventh Circuit held that such a comparison did not establish that Hong was meeting her employer's legitimate job expectations due to the fact that she had been repeatedly disciplined. Further, in considering this prong of the plaintiff's *prima facie* case, the Seventh Circuit has held that it is "concerned with neither the correctness nor the reasons for" the employer's actions. *Cengr v. Fusibond Piping Sys., Inc.*, 135 F.3d 445, 453 (7th Cir. 1998). In other words, a plaintiff merely second-guessing his or her employer's assessment of job performance is insufficient to establish this prong and carry the plaintiff's burden of proof.

Similarly here, McKinney repeatedly argues that the discipline issued to him was

unwarranted, which is not evidence to prove that he was meeting Defendant's legitimate employment expectations. As the Seventh Circuit held in *Cengr*, the Court is not to second-guess defendant's assessment of its employee's performance and the standard is not whether defendant was correct in its assessment. McKinney argues that he was not properly trained, but it is not clear if this argument is intended to explain away his performance deficiencies or to allege an act of intentional refusal to train him based on his race. Regardless, he does not set forth any facts to show that Sheriff Hodges, who discharged him, refused to train him. McKinney admits that when he approached the Sheriff about feeling that he was not getting to go on enough runs, Sheriff Hodges personally took him out on the road. Further, he does not dispute all of the training that defendants showed the Court in its Statement of Undisputed Material Facts, including taser class, combatives and firearms training, drug interdiction training, being assigned multiple officers whom he rode with throughout the initial portion of his time with the Whitley County Sheriff's Department, and eight hours of in-person firearms and eight hours of defensive tactics training. Further, as defendants have explained in their Statement of Undisputed Material Facts, McKinney indicated that everything in the PowerPoint training he was given was "all stuff I knew." Thus, it is unclear how his claimed lack of training is supportive of his inability to follow Sheriff Department rules and regulations, if that is the purpose intended by McKinney. Regardless, McKinney's quarrel with defendant's assessment of whether he was meeting the legitimate expectations of employment is insufficient to carry his burden of proof on the second prong of his *prima facie* case. Accordingly, defendants are entitled to summary judgment.

Defendants also argue that McKinney cannot establish that similarly situated employees outside of his protected class were treated more favorably. Defendants contend that it is

undisputed that Caucasian officers and other employees had been terminated for similar violations, and therefore were not treated more favorably than McKinney. The only employee whom McKinney points to as being treated more favorably than himself is Kory Bailey. However, McKinney does not disclose any evidence that Deputy Bailey was treated more favorably than McKinney because of his race. Furthermore, "comparative" evidence is dispositive for summary judgment purposes only if it shows "systematically more favorable treatment toward similarly situated employees not sharing the protected characteristic." *E.E.O.C. v. Our Lady of Resurrection Med. Ctr.*, 77 F.3d 145, 151–52 (7th Cir. 1996); *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir.1994) (must be evidence that non-protected employees received "systematically better treatment"). In *Our Lady*, the Court found that the EEOC presented no evidence of systematically more favorable treatment of white social workers than black social workers at the Center and thus failed to prove the Center intentionally discriminated against the plaintiff because of her race. *Id*. Similarly here, McKinney only points to one other employee who he claims was treated more favorably – Kory Bailey.

McKinney claims that other white officers were treated more favorably than him in terms of discipline. He points to other employees, providing only partial facts and documentation regarding discipline, but has not shown any evidence of how their circumstances were substantially similar to his or that the difference in discipline was based on an intent to discriminate. As defendants note, McKinney has not taken any depositions in this case – not even of any of the decisionmakers. Thus, he has no testimony, other than his own, regarding the reasons for the decision as to the extent of discipline. Rather, he relies solely on his own self-serving, speculative and conclusory testimony.

Further, while McKinney asserts, without evidence or facts, that other officers were treated more favorably than him in terms of discipline, such a conclusory assertion is not enough; rather, he has to show the context of his comparison. "Statistical evidence is only helpful when the plaintiff faithfully compares one apple to another." *Hemsworth*, 476 F.3d at 492. (rejecting plaintiff's proposed statistical evidence where it lacked "the necessary context needed for a meaningful comparison"); *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 319 (7th Cir.2003) (noting "the importance of looking to the proper base 'group' when making statistical comparisons and examining all of the surrounding facts and circumstances which create the statistics themselves"). In the present case, McKinney does not even present any statistics. Rather, he submits three documents regarding three employees – (1) a Notice of Waiver of Hearing, without anything to show the Court the context of the discipline against the officer or how he is similarly situated to McKinney, (2) a memo dated November 11, 2014 that a fellow officer, Kory Bailey, had used his taser on another officer while off duty, and (3) a memo dated June 4, 2010 that Deputy Helfrich had failed to activate his in-car camera and made an inappropriate, insensitive comment to the mother of an arrestee. These three isolated incidents of discipline, without any other information or documentation to put them in context, is insufficient to show disparate treatment of Caucasian officers by defendant. Even in his affidavit, McKinney only presents his own version of incidents of misconduct or discipline, again without any support or context to carry his burden to show substantial similarity. This is insufficient to carry his burden of proof. McKinney cannot establish a *prima facie* case of discrimination under the indirect method of proof, and summary judgment for the defendants is warranted.

In any event, even if McKinney had presented a *prima facie* case of discrimination, his

claim nevertheless fails because defendants have set forth legitimate, non-discriminatory reasons for his termination – specifically, the numerous incidents of discipline discussed above. Thus, the burden shifts to McKinney to show that the reasons given for his termination were pretextual.

A pretext is a deliberate falsehood. *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir.2000) ("Pretext means a dishonest explanation, a lie rather than an oddity or an error.") The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise or well-considered. *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000). An employer's mistaken belief that the plaintiff's conduct merited termination is not unlawful, so long as the belief was honestly held. *See Wade v. Lerner N.Y., Inc.*, 243 F.3d 319, 323 (7th Cir. 2001) (plaintiff's age discrimination claim failed where her employer mistakenly, but honestly, believed the plaintiff had been late for work). A plaintiff's own opinions about her work performance or qualifications do not sufficiently cast doubt on the legitimacy of her employer's proffered reasons for its employment actions and cannot create an issue of material fact. *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1181 (7th Cir. 2002.) Without proof of a lie as to what the employer believed, no inference of discriminatory motive can be drawn. *Id.* The Court is not to sit as a "superpersonnel department" to second guess the employer's decisions. *Id.* Pretext requires that the plaintiff show more than a disagreement with his employer's assessment of whether he has met the legitimate expectations of employment as the reason for discharge; rather, he must show evidence that the employer lied about its reasons for firing the plaintiff. *Hill v. Tangherlini*, 2013 WL 3942935 (7th Cir. 2013) (internal citations omitted.)

In the present case, McKinney has failed to present any evidence that the reasons given for his termination were pretextual. In response to defendants' interrogatories regarding how

McKinney would establish that the reasons given for his termination from employment were a

pretext for discrimination or retaliation, Plaintiff responded:

> The reasons for termination were without merit and hold no substance. I was
> intentionally targeted and terminated due to me being an African-American and
> working on a predominantly, if not all Caucasian Department. Please refer to
> EEOC Charge for an overview.

(Defendants' Ex. 7, no. 17.) This is not evidence of pretext; rather, it is simply a recitation of

McKinney's allegations and his own opinions about his work performance or qualifications,

which the Seventh Circuit has held does not establish pretext or intent to discriminate.

In his response, McKinney has presented absolutely no evidence that the reasons given by

Defendant for his termination were a pretext for discrimination. Rather, he offers the Court

nothing more than his own self-serving, conclusory disagreements with the reasons for his

termination and his own opinion of how the Sheriff was wrong in his assessment of McKinney's

performance. This is not proof of a pretext or lie on the part of defendant. Thus, McKinney has

failed to prove pretext and summary judgment is appropriate on this basis also.[2]

This court finds that McKinney has failed to present any evidence that his termination

was due to discriminatory reasons. Therefore, summary judgment will be granted in favor of the

defendants on McKinney's Title VII discrimination claim. Likewise, as McKinney's Equal

Protection claim only relates to his employment discrimination claim, which is governed by the

---

[2] Additionally, the Seventh Circuit has held that courts can find that a plaintiff has failed
to show an intent to discriminate on the basis of race when it is undisputed that the same person
hired and fired the plaintiff, and that the same hirer/firer inference has strong presumptive value.
*E.E.O.C. v. Our Lady of Resurrection Med. Ctr.*, 77 F.3d at 151–52. Similarly here,
former Sheriff Mark Hodges both hired and fired McKinney within one year. If Sheriff
Hodges wanted to discriminate against McKinney based on his race, he could have refused
to hire him in the first place.

same *McDonnell Douglas* burden-shifting method of proof, summary judgment will be granted on the Equal Protection claim also. *Hildebrandt v. Illinois Dept. of Natural Resources*, 347 F.3d 1014, 1-37-38 (7th Cir. 2003).

Defendants also seek summary judgment on McKinney's retaliation claim. McKinney claims that he was retaliated against by being "warehoused", delayed in attending the ILEA and later terminated, because he informed Whitley County that he knew that there was a racial slur made about him in the department. Defendants contend that McKinney's own deposition testimony contradicts this allegation. In his deposition, McKinney specifically testified that he never reported to his supervisors any comments, jokes, statements or anything that made him feel uncomfortable during his time at the Sheriff's Department. McKinney further testified that he did not report the use of a racial slur allegedly used by Officer Scott Schmidt to Sheriff Hodges or to Chief Deputy Gatton.

As with discrimination claims, a plaintiff may establish retaliation under the direct or indirect method of proof. *Porter v. City of Chicago*, 700 F.3d 944, 957 (7th Cir. 2012). To survive summary judgment on a Title VII retaliation claim under the direct method of proof, a plaintiff must submit evidence from which a jury could reasonably conclude that (1) he engaged in statutorily protected activity; (2) he suffered a material adverse action; and (3) a causal link between the two. *Id.* at 957. To prove retaliation under the "indirect method" a claimant must make an initial showing that "(1) he engaged in a statutorily protected activity; (2) he met the employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006)

Defendants argue that in the present case, McKinney has failed to carry his burden of establishing a *prima facie* case of retaliation because he did not show that he met factor one; namely, he has failed to show that he engaged in a statutorily protected activity. To meet his burden, McKinney had to demonstrate that he "opposed an unlawful employment practice" by, for example, filing a prior complaint about unlawful discrimination under Title VII, *i.e.*, discrimination on the basis of race, color, religion, sex, or national origin. *Id*. at 663–64. Plaintiff admits that he never reported any racial slurs, inappropriate comments, jokes or statements to any superiors including Sheriff Hodges. Thus, he never engaged in a "statutorily protected activity," and his *prima facie* case of retaliation fails. Further, the allegations in McKinney's Complaint that he was not trained or was "warehoused" is belied by his own testimony outlining the training that he received, the fact that Sheriff Hodges took him out on the road himself and allowed McKinney to go out on his own even before completing the Academy. Therefore, summary judgment will be granted in favor of the defendants on the retaliation claim.

McKinney has also alleged in his Complaint that Deputy Helfrich is liable to him for unlawful seizure because he lacked a warrant or probable cause. However, McKinney was stopped by Deputy Helfrich for an investigatory stop in response to a 911 call regarding a pickup truck carrying a stolen refrigerator. Police officers are not required to have probable cause to believe that a person is involved in a crime in order to detain him for a brief investigatory stop. *Ramos v. City of Chicago*, 716 F.3d 1013, 1017 (7th Cir. 2013.) Rather, officers are allowed to conduct such an investigatory stop where they simply have reasonable suspicion, based on specific and articulable facts, that a crime is occurring. *Id*. That standard is less demanding than probable cause, and requires more than an unparticularized hunch but less than a probability or

substantial chance that criminal activity exists. *Id.* "[S]o long as the suspicion ... is supported by specific, identifiable facts, it is an objectively reasonable suspicion that satisfies *Terry*." *Id.* A 911 report of an emergency situation can provide police with reasonable suspicion to conduct a stop, particularly where the caller identifies him or herself. *United States v. Drake*, 456 F.3d 771, 774–75, 2006 WL 2256912 (7th Cir. 2006.) A 911 system designed to provide an emergency response to telephonic tips could not operate if the police had to verify the identity of all callers and test their claim to have seen crimes in progress. *United States v. Wooden*, 551 F.3d 647, 650 (7th Cir. 2008.)

In the present case, it is undisputed that the Sheriff's Department received a 911 call regarding the theft of a refrigerator from a house under construction by a person in a green Ford Ranger, and that the truck was headed northbound on CR 800E. The 911 caller was talking to the dispatcher simultaneously with watching the truck leaving the house with the refrigerator, and described the driver of the truck as a black male. McKinney admits that at that same time, he was driving a Ford Ranger with a refrigerator in the back and was heading northbound on CR 800E. The caller provided his name, phone number, and his place of employment and indicated that he knew the owner of the home. Based on this 911 call, which matched the circumstances observed by Deputy Helfrich of a Ford Ranger carrying a refrigerator at that same time northbound on CR 800 E, Deputy Helfrich clearly had sufficient reasonable suspicion to stop McKinney to investigate the 911 call.

An investigatory detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. *United States v. Bullock*, 632 F.3d 1004, 1015-16 (7th Cir. 2011.) There is no rigid time limit placed on *Terry* stops; "common sense and ordinary human

experience must govern over rigid criteria. *Id*. When determining the reasonableness of the length of detention, the court should consider the law enforcement purposes to be served by the stop, the time reasonably needed to effectuate those purposes, and whether the police diligently pursued their investigation. *Id.* (detention of 30-40 minutes was reasonable); *Cady v. Sheahan*, 467 F.3d 1057, 1063 (7th Cir. 2006) (stop of 20-30 minutes reasonable.) Here, McKinney claims that the stop only lasted two to three minutes. The video of the stop shows that it lasted approximately seven minutes and McKinney was handcuffed for only three minutes. This short detention, which enabled Deputy Helfrich to determine whether McKinney lawfully owned the refrigerator, was reasonable.

In his response brief, McKinney acknowledges that "[a]ny claim for unlawful seizure is not well founded given the 911 call's content and appropriate law enforcement dispatch." Thus it appears that McKinney is conceding his unlawful seizure claim, as he well should, as the stop was clearly lawful.

However, McKinney has not conceded his excessive force claim. A claim that a police officer has used excessive force in the course of an arrest, investigatory stop or other "seizure" of a citizen are evaluated under the Fourth Amendment's objective reasonableness standard. *Graham v. Connor*, 480 U.S. 386, 395 (1989.) Once police have the reasonable suspicion required to justify an investigatory stop, they may use reasonable means to effectuate that stop. *United States v. Felix-Felix*, 275 F.3d 627, 636 (7th Cir. 2001.) An officer's use of force is unreasonable if, judging from the totality of the circumstances at the time of the arrest, the officer uses greater force than was reasonably necessary to effectuate the arrest. *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 519 (7th Cir. 2012). The reasonableness of a particular use of force must be

judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight and without regard to the intent or motivation. *Graham*, 480 U.S. at 396-7. *De minimis* touching does not constitute excessive force as a matter of law. *Fillmore v. Page*, 358 F.3d 496, 504-05 (7th Cir. 2004).

McKinney claims that the excessive force used by Deputy Helfrich was pointing a gun at him, handcuffing him, pulling him up in handcuffs and detaining him for an "amount of time." Deputy Helfrich, by McKinney's own admission and as shown in the video of the stop, only handcuffed McKinney for two to three minutes. McKinney has not shown that the use of handcuffs constituted excessive force:

> We have on occasion recognized valid excessive force claims based on overly tight handcuffs. In *Payne v. Pauley*, 337 F.3d 767 (7th Cir. 2003), there was evidence that the arresting officers handcuffed the plaintiff so tightly she lost feeling in her hands and refused to loosen the cuffs when she told them of the numbness. *Id.* at 774-75, 781. The plaintiff later underwent two carpal tunnel surgeries she said were necessitated by the handcuffing, and we held summary judgment under these circumstances was inappropriate. *Id.* at 775, 780-81… Here, Tibbs complained only once to Officer Kooistra, gave the officers no indication of the degree of his pain, experienced minimal (if any) injury, and sought no medical care… The record here indicates the following: Tibbs likely suffered some discomfort and pain from handcuffs that Officer Kooistra applied somewhat too tightly; Tibbs complained to Officer Kooistra once about his handcuffs without elaborating on any injury, numbness, or degree of pain; Tibbs was handcuffed for about twenty-five to thirty minutes (from the time of his arrest to his arrival at the lockup facility); he experienced redness on his wrists for less than two days; and he neither sought nor received medical care for any alleged wrist injury. Tibbs cites no cases in which any court has permitted a plaintiff to reach a jury based on such mild allegations. We agree with the district court that no reasonable jury could find Officer Kooistra's actions were objectively unreasonable.

*Tibbs v. City of Chicago*, 469 F.3d 661, 666 (7th Cir. 2006.) In the present case, McKinney states that the mere fact of being handcuffed was excessive force, but does not even complain that the handcuffs were too tight, or that he suffered any injury or needed medical treatment as a result of

being handcuffed. Obviously, the mere use of the handcuffs did not constitute excessive force. As the Court has seen from the video of the traffic stop, Deputy Helfrich did not "pull him up by the handcuffs." Rather, it is clear in the video that Deputy Helfrich placed his hand on McKinney's arm, rolled him over and then assisted McKinney in standing up by holding onto McKinney's arm. (Defendants' Ex. 6, video at 4:15.) Deputy Helfrich clearly did not use excessive force in handcuffing McKinney or assisting him to his feet while he was handcuffed. In fact, the entire incident, as shown on the video, is a textbook-perfect example of how a *Terry* stop should be effectuated. Deputy Helfrich and McKinney both acted and reacted exactly the way they were supposed to during a stop. They were both calm, respectful, polite and efficient. There is absolutely nothing in the video of the stop that supports a claim of excessive force.

Finally, even if McKinney had shown that Deputy Helfrich pointed his gun at McKinney, such an act is not an excessive use of force. Police are allowed to point their guns when there is reason to fear danger. *Williams v. City of Champaign*, 524 F.3d 826, 827–29 (7th Cir.2008) (finding no excessive force when officers pointed their guns at someone who they reasonably believed might have committed a double robbery moments before). And when performing a valid investigatory stop, an officer's pointing a gun at a person is not *per se* unreasonable. *Wilkins v. May*, 872 F.2d 190, 194 (7th Cir.1989.) An officer has a right to protect himself, and to pursue his investigation without fear of violence. *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Here, Deputy Helfrich was called to respond to a 911 call for a burglary of a home under construction which the 911 caller stated was in progress as he was making the call. Thus, in accord with *Williams,* it would be objectively reasonable for Deputy Helfrich to initially show his weapon. Further, as shown in the video of the stop, Deputy Helfrich had his

weapon holstered as he approached McKinney, handcuffed him and during the remainder of the stop; thus, even if McKinney's version of events are accepted as true, Deputy Helfrich did not violate McKinney's Fourth Amendment rights.

Additionally, qualified immunity gives government officials "the benefit of legal doubts." *Elliott v. Thomas*, 937 F.2d 338, 341 (7th Cir. 1991.) Qualified immunity will shield a law enforcement officer from § 1983 liability if a reasonable officer could have believed his actions to be lawful, in light of clearly established law and the information the officer possessed. *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 3040 (1987)). Even if a court were to hold that an officer violated the Fourth Amendment, *Anderson* still operates to grant officers immunity for reasonable mistakes as to the legality of their actions. *Leaf v. Shelnutt*, 400 F.3d 1070, 1079 -1080 (7th Cir. 2005.) It is the plaintiff's initial burden in a § 1983 case to prove the unreasonableness of an officer's belief, as opposed to the defendant's onus to demonstrate the reasonableness thereof. *Tangwall v. Stuckey*, 135 F.3d 510, 518 -519 (7th Cir. 1998.) Further, it is irrelevant that McKinney was not charged with any wrongdoing. *Id*. at 520. In the present case, it was reasonable for Deputy Helfrich to suspect, based on the totality of the circumstances, that McKinney had or was committing the crime of theft, to briefly detain McKinney to investigate the situation, and to use the minimal amount of force that McKinney describes. Thus, Deputy Helfrich is entitled to qualified immunity from all of McKinney's federal claims.

The defendants argue that McKinney's state law claims are barred for failure to serve a timely and sufficient notice of tort claim as required by the Indiana Tort Claims Act (ITCA). This Court agrees that any state law claims raised by McKinney with regard to the stop performed by Deputy Helfrich on July 6, 2013, including but not limited to false arrest, battery

and intentional infliction of emotional distress, are barred because McKinney failed to file a timely notice of tort claim regarding the incident. (*See* Defendants' Ex. 8, Notice of Tort Claim.) The record shows that McKinney filed a Notice of Tort Claim and Amended Notice of Tort Claim on June 30, 2014, alleging only that he was wrongfully terminated. He includes a line that "my son endured psychological stress due to my son seeing a gun pointed at his father by Deputy Anthony Helfrich." However, this does not constitute notice as required by the ITCA for his state law claims regarding the stop or any use of force by Deputy Helfrich. The Notice does not refer to the July 6, 2013 incident, it does not mention any claims that McKinney is making for himself or what those claims are, and it is well outside of the 180 days within which it was required to be filed under the IC 34-13-3-8. The ITCA provides that the notice must contain a number of details concerning the loss, including: the circumstances which brought about the loss, the extent of the loss, the time and place the loss occurred, the names of all persons involved, the amount of the damages sought, and the residence of the person making the claim at the time of the loss and at the time of filing the notice. Ind.Code § 34–13–3–10. The purpose of the notice requirement is to inform officials with reasonable certainty of the accident or incident and surrounding circumstances so that the state may investigate, determine its possible liability, and prepare a defense to the claim. *Ricketts v. State*, 720 N.E.2d 1244, 1246 (Ind. Ct. App. 1999.) In order to constitute substantial compliance, the notice must not only inform the governmental entity of the facts and circumstances of the alleged injury but must also advise of the injured party's intent to assert a tort claim. *Id*. McKinney's notice of tort claim meets none of these requirements and is untimely; thus, his state law claims are barred.

McKinney admits in his response to defendants' Motion for Summary Judgment that he

never served a notice of tort claim regarding the stop by Deputy Helfrich, and that the notice of tort claim was only directed toward his termination. (Plaintiff's Reply brief, p 24.) Despite this admission, McKinney inexplicably argues that his state law claim for intentional infliction of emotional distress arises from Deputy Helfrich's individual actions which "stand on their own without the necessity of filing notice under the ITCA" and is for the jury to determine. McKinney further argues that his state law claim of battery is a jury question. However, any and all state law claims raised by McKinney, including intentional infliction of emotional distress, false arrest and battery, are barred because McKinney has admitted that he never served a notice of tort claim regarding any actions by Deputy Helfrich during the traffic stop.

Thus, the only remaining claim is his claim against Deputy Helfrich individually for excessive force in violation of his constitutional rights, of which McKinney has produced no evidence. McKinney's assertion that Deputy Helfrich pushed his knee into his back and pulled him up by the handcuffs is belied by the videotape of the incident. As can be clearly seen in the video, Deputy Helfrich does not pull McKinney up by the handcuffs and does not place his knee on McKinney's back. Even if the Court were to blindly accept these assertions by McKinney, neither act would constitute excessive force. The Fourth Amendment "reasonableness" inquiry regarding excessive force claims is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *Graham v. Connor*, 109 S. Ct. 1865, 1867 (U.S. 1989.) The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Id*. at 1872. The Supreme Court held in *Graham* that "not every push or shove, even if it may later seem unnecessary in the peace of a judge's

chambers, violates the Fourth Amendment." *Id.* The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation. *Id.*

In his response, McKinney indicates only that it "hurt" and was "uncomfortable" when he was handcuffed or when he claims Deputy Helfrich placed his knee in his back and pulled him up by the handcuffs. Again, the videotape shows no such action by Deputy Helfrich; however, discomfort does not rise to the level of excessive force. Further, Deputy Helfrich is entitled to qualified immunity as a reasonable officer would not believe that the actions taken in temporarily handcuffing McKinney, even putting his knee on his back to do so, and assisting him to his feet constituted excessive force. Thus, Deputy Helfrich is entitled to judgment as a matter of law on McKinney's excessive force claims.

Conclusion

On the basis of the foregoing, the defendants' motion for summary judgment [DE25] is hereby GRANTED in its entirely.

Entered: November 14, 2016.

s/ William C.  Lee
William C. Lee, Judge
United States District Court